[Cite as *Quest Workforce Solutions, L.L.C. v. Job1USA, Inc.*, 2016-Ohio-8380.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Quest Workforce Solutions, LLC

    Appellant

v.

Job1USA, Inc.

    Appellee

Court of Appeals No. L-15-1189

Trial Court No. CI0201403549

**DECISION AND JUDGMENT**

Decided:  December 23, 2016

* * * * *

Eugene F. Canestraro, for appellant.

William R. Lindsley, for appellee.

* * * * *

**PIETRYKOWSKI, J.**

**{¶ 1}** Appellant, Quest Workforce Solutions, LLC (hereinafter "Quest"), appeals from the June 15, 2015 judgment of the Lucas County Court of Common Pleas granting judgment in favor of appellee, Job1USA, Inc. (hereinafter "Job1"), on Quest's claim for breach of contract and to compelling an accounting.  Because we find the trial court's

judgment was contrary to the manifest weight of the evidence, we reverse. Quest asserts the following assignments of error on appeal:

[1.] The trial court erred when it found, "... based on the facts and circumstances and the course of conduct after November 2009, it is clear that the September 25, 2007 Agreement was terminated as of November 2009..." since plaintiff never abandoned its duties under the PSA and provided overwhelming and uncontroverted evidence of defendants' breach of contract, thereby rendering the trial court's opinion against the manifest weight of the evidence.

[2.] The trial court erred when it found, plaintiff's [Appellant's] claim for breach of contract fails, "... as a matter of law...", since plaintiff believes it provided overwhelming and uncontroverted evidence – all of which was initially prepared by the defendant, that the defendant's claim of financial hardship (failure to make a profit) was completely false, and defendant never delivered a factual "good cause" termination notice, which is contractually required – since it (JOB1) was operating at a profit.

[3.] The trial court erred when it failed to award damages and prejudgment interest to plaintiff for the defendant's breach of contract – which was proven by the plaintiff.

{¶ 2} In August 2014, Quest brought suit against Job1. Quest asserted it fully performed under a contract to refer clients to Job1, which received the benefit of such

2.

referrals. Quest further asserted it repeatedly requested an analysis and accounting of the profits due to Quest under the contract, but Job1 refused and continues to refuse to provide a full accounting and to pay Quest the sums due under the agreement. Quest asserted several causes of action against Job1, but the only claims pertinent to this appeal are damages for breach of a contract and for an accounting of all sums due Quest under the contract. A trial to the bench was held on April 14-16, 2015, and the following evidence was submitted.

## Factual Evidence Presented at Trial

{¶ 3} Neil Intrater and Jack Hackett were partners in Quest, a limited liability company involved in the employment services business of recruiting the placement of referrals and direct hire services. Bruce Rumpf is the owner of Job1, a business also engaged in the employment services business providing staffing/human resources, security, and healthcare services. Christopher Kelly was the CFO of Job1 until May 2010. His successor was Matt Wolfe, CPA.

{¶ 4} In 2007, Intrater, Hackett, Kelly, and Rumpf met to negotiate a referral partnership. Kelly testified he knew Hackett personally and met Intrater through Rumpf. Rumpf acknowledge having known Intrater for 20 years. Intrater testified he and Hackett sought out Job1 as a staffing partner because it had a large credit line. Quest had a client, Yamada N.A., an automotive supplier, with a large staffing referral need, which Quest could not provide because it did not have a large credit line to handle payroll. The Yamada account was a desirable client to Job1 because the company required referrals of

3.

80-to-100 personnel and this amount was expected to increase. Quest also brought to the relationship another large account, "Garick," but the account was lost shortly afterward when the owner was accidently killed. Rumpf testified Intrater presented a list of other potential companies with which Quest had developed relationships. Rumpf believed Quest would be able to develop a tremendous amount of additional clients for Job1 to service.

{¶ 5} Their negotiations ultimately led to the execution of a Memorandum of Understanding, Referral and Profit Sharing Agreement (hereinafter "PSA") on September 25, 2007. Kelly drafted the PSA. Both Kelly and Intrater testified the parties agreed (and the PSA language supports) that Quest would recruit staffing referrals and direct hires and Job1 would provide the personnel for those referrals and administer the payroll. After Quest made a referral under the PSA to Job1, Quest had no further obligation. There were also no minimum number of referrals or placements required of Quest under the contract and no further responsibilities outlined that Quest had to perform after a referral was made. Job1 was to provide all services to fully maintain the relationship with the client. Staffing referrals were people employed by Job1 to work for Yamada and were paid a fee based on the hourly services provided. The gross profits generated by the referral of staffing persons was to be equally divided as well, less certain specified expenses.

{¶ 6} The PSA provided the two companies agreed to share the profits generated under the contract within ten days of payments being received. The parties also agreed to

4.

maintain records of such activity and provide monthly statements. The gross profit was defined in Exhibit A attached to the PSA and signed by the parties: Regarding Quest clients Garick and Yamada, the profit to be split was gross profit "(revenue less ee salaries, burden) less direct expenses to service customer" and the cost of the account manager, Valarie Wagner. The parties agreed that Job1 would employ one permanent staff person, Wagner, who had first developed the relationship with Yamada and had been working for Quest. Regarding all future clients, the profit to be split was gross profit "(revenue less ee salaries, burden) less direct expenses (travel, On-location, recruiting, advertising, etc. related to this account)." Furthermore, the parties agreed that Job1 was to pick-up Wagner's ongoing direct expenses (salary, benefits, car allowance, and commission)."

{¶ 7} As noted above, "direct expenses" were partially identified in the PSA. Kelly and Intrater both testified that these were viewed as expenses related to servicing the client. They also both testified that indirect expenses, such as administrative support costs, back office costs, and banking costs were specifically excluded from the contract even though no reference was made to them in the contract. The contract merely identified the expenses which were to be included. Kelly further testified "back office expenses" are those underneath the gross profit line, including staff salaries, legal accounting, and everything else related to selling and general administrative expenses.

{¶ 8} Wolfe testified, however, that he subtracted 3 percent of sales for back office costs from the income generated because the cost is a direct cost to service the client and

is commonly deducted from gross profit according to his training as a CPA. He believed such direct costs could be between 3 percent and 7 percent, but he capped the expense at 3 percent to ensure that he did not overstate the cost. Wolfe testified Rumpf did not request that he add this cost. Wolfe further testified he did not consult the contract as to whether this cost was to be included. Wolfe agreed that Kelly had not included this cost in the income statements he prepared. This additional expense totaled $233,283.66 for the years 2009-2012. Quest asserts that removal of this expense alone results in a gross profit for all five years.

{¶ 9} Kelly and Intrater testified (and Exhibit A to the PSA confirms) that, pursuant to their negotiations, Quest was given free office space in Job1's office building, including telephones and internet access. Job1 also gave Quest access to a recruiting database. Intrater testified Rumpf asked Quest to be in the same building to help Job1 develop recruiting and to be close from the staffing standpoint to help develop new staffing clients. After one year, however, Rumpf had rented the space Quest occupied and Quest left the building in April 2009. While Quest was offered space on the first floor, Intrater did not like being close to Rumpf employees whom Intrater testified had pestered Quest about meetings and matters unrelated to Quest's business.

{¶ 10} Both Kelly, Intrater, and Hackett agreed the PSA did not terminate when Quest left the building. Hackett believed that the PSA would continue as long as Yamada remained a client even if Quest no longer brought in new clients. There had been no discussion about nor a requirement in the contract that Quest stay in the building for the

6.

PSA to continue. Intrater testified that when Quest left Job1's offices in 2009, Quest never set up another office. Hackett testified they decided to work out of their homes. Intrater testified Quest was basically a shell company and was not doing any business. Kelly also testified there were no referrals from Quest after November 12, 2009. Hackett testified that Quest's Columbus, Ohio, office remained open until 2010.

{¶ 11} When Quest moved out of the Job1 offices, and several other times, Rumpf asserts he orally terminated the contract. He also testified that he assumed that when Quest moved out and closed their offices, the PSA was terminated. Rumpf did not testify of any specific time when he told Intrater or Hackett the PSA was terminated. Rumpf still hoped they could make some business deals even after Quest moved out of the building. Job1 continued to send financial reports if requested.

{¶ 12} The PSA provided it could be terminated at any time for good cause by giving 30 days' notice prior to termination. Kelly could not recall what the parties had intended the phrase "good cause" in the last paragraph of the contract to mean, but believed it carried the typical meaning that there had to be some tangible reason to cancel the contract. Kelly testified that one basis for desiring to terminate the profit-sharing agreement was that Job1 had borne all the losses. However, he acknowledged on cross-examination that the agreement provided that Job1 was to bear the losses if the agreement was not financially successful. Kelly and Hackett agreed that the failure to make a profit would have been a justifiable cause for terminating the PSA. There also was no provision in the PSA for terminating the sharing of profits generated by a referred client.

7.

{¶ 13} Kelly also testified the PSA was never formally terminated and he was unaware of any attempt to orally terminate the contract. Both Intrater and Hackett testified they never received any notice, written or oral, from Job1 indicating that it desired to terminate the PSA. Intrater received a letter from Rumpf on February 9, 2012, after the lawsuit was filed, attaching an unexecuted letter Rumpf dated November 13, 2009, wherein Rumpf indicating that the PSA was terminated as of December 13, 2009.

{¶ 14} Kelly testified he had circulated an internal email November 12, 2009 in response to Intrater's inquiry about Quest's inability to access the recruiting database. Rumpf informed Kelly that Job1 had switched to using Craig's List and traditional resources. Kelly informed others at Job1 that there was no longer a working relationship between Quest and Job1 and that a formal cancellation of the PSA was being drafted. Kelly testified he had recommended terminating the agreement because there was a recession and he was evaluating all expenses and the company did not seem to be making any money under the contract. He communicated his recommendation to terminate the PSA to Rumpf in November 2009. Kelly could not recall if he was told by Rumpf to prepare a formal termination letter, but Kelly recalled drafting a termination letter dated November 13, 2009, revising it, and circulating it to certain people for their comment and support. Rumpf, however, testified he directed Kelly to prepare a termination letter and that Rumpf revised it to more fully address the issues with the Yamada account. Rumpf testified he directed Kelly to send the letter, but Kelly testified he never mailed the letter nor communicated to Hackett the intent of Job1 to terminate the PSA. Rumpf testified he

8.

assumed the letter had been mailed because he never heard from Quest for the next two and one-half years. Kelly denied telling Rumpf or any co-worker that the termination letter was hand-delivered or mailed and denied having been instructed by Rumpf to dispatch the letter. Because Kelly never received authorization to send the letter, he did not.

{¶ 15} Rumpf testified that he told Intrater that the Yamada account had a lot of problems and that Job1 was not making any money on this account. Rumpf assumed that Kelly would have relayed that information to Hackett.

{¶ 16} Kelly further testified that when he terminated his employment in May 2010, Job1 was still performing services under the PSA. Kelly and Intrater testified the PSA did not terminate in November 2009, even though there was never another referral of any kind whatsoever from Quest to Job1 after November 13, 2009. Kimberly Hall, Vice President of Human Resources for Job1, testified that Kelly had told her on November 9 or 10, 2009, to be prepared to remove the access of Quest to the Career Builder Account and change the security code on the building to be effective when he directed.

{¶ 17} Kelly testified his opinion to terminate the PSA was based on the financial statements. Rumpf testified the PSA was not profitable and yet could not confirm whether the WC calculations or payroll figures were incorrect or not. Rumpf testified that he desired to terminate the relationship because it had become very one sided. He believed that Quest had an obligation to be more involved with the Yamada account and

9.

was supposed to be learning the business and participating in the meetings with Yamada plant managers on an ongoing basis. This issue, however, was not addressed in Kelly's draft of the termination letter. Rumpf also testified his staff did not want to work with the Quest clients. Rumpf testified, however, he continued to service the Yamada account even though the PSA was not profitable because he had to build a business relationship first with Yamada (who negotiated very hard on profit margins and was very demanding) in order to expand its services to other Japanese companies, including Honda, based on the recommendation of Yamada, which would lead to larger staffing accounts. Unexpectedly, there was a significant downturn in business after a tsunami hit Japan in 2011. Rumpf lost all of the Yamada staffing referrals and incurred $110,000 of unemployment costs, which would increase the rate given to Job1 for years afterward. Rumpf testified Job1 renegotiated a new contract in 2012.

{¶ 18} Kelly could not recall whether during the period of November 2009 to 2010, if there was ever a single inquiry by Quest about the status of any of the accounts. But, Kelly testified there were previously periods of time when there was no communication between the two companies. Intrater testified, however, he requested of Rumpf or Kelly numerous times to see the financial statements and revenue reports of Job1. Intrater also testified he would see Rumpf socially and would inquire of him as to the status of the Yamada account. Intrater recalled that Rumpf always stated the Yamada account "was a dog with fleas," a loser, or that Job1 was losing money. Rumpf denied ever having had such a conversation with Intrater and denied knowing Intrater socially.

10.

Hackett also testified he continued to talk to Rumpf and Kelly about the Yamada account after Quest vacated the building. Both Intrater and Hackett testified they were provided income statements occasionally, but the statements always reflected losses.

{¶ 19} Kelly e-mailed Intrater on September 3, 2009 regarding an income statement for Yamada for the period of September 1, 2008 through July 31, 2009. Intrater testified that he inquired because he had become aware that Honda was increasing their workforce. This income statement reflected a $57,487.68 loss for the fiscal year. This statement was five-to-six months after Quest had vacated the Job1 facility. The statement reflected workers' compensation (hereinafter "WC") payments of $75,435.21. Kelly testified that his information would have been inputted by Hall and that he did not personally verify the information as there was no reason to question the amounts. No income statements were issued after September 2009.

{¶ 20} Hackett testified that he examined the income statement for the period of June 29, 2008 through August 2, 2008. From his calculations, the WC rate was overstated. So, he requested various accounting records in discovery. Wolfe admitted it would have been the responsibility of Job1 to keep the WC records for the Yamada account.

{¶ 21} Quest first received a five-year accounting summary of the gross profit earned under the PSA prepared by Wolfe, which Wolfe testified was created pursuant to generally-accepted accounting principles he followed as a CPA. Wolfe used the figures determined by Kelly and added the remaining financial information for 2008 and 2009.

11.

After requesting additional documentation to support the figures on that summary, Quest received another summary on November 25, 2013, which included copies of tables of the WC blended rates for Yamada and a summary of the WC rates, total wages, and the WC cost, less the rebates for the Yamada account for years 2011 and 2012. Wolfe reworked all of the figures for all of the years and believed the substituted summary reflected the correct WC costs. After utilizing the revised WC wages and costs, Hackett determined that the WC expense had been overstated by $512,252 and deducting this amount resulted in a gross profit for each of the five years.

{¶ 22} Quest also received additional WC information from Hall in October or November 2014. These exhibits contain screenshots from the WC Bureau showing the actual payments made to the WC Bureau. Additional documentation of the WC payments was received. Wolfe testified the billable wages could not be verified because the time records no longer existed. However, he also testified that Yamada approved the billable wages each pay period.

{¶ 23} While Wolfe testified he knew the WC numbers were off in 2013, he did not discover until the day before trial that the WC payments to the WC Bureau had been underpaid and that substituted summary included WC costs which were not correct. He was confident that Hall used the correct WC rate. He explained the error was not in what was reported on the income statement, but in what they actually paid to the WC bureau. However, Wolfe never submitted additional discovery to notify Quest of the error. At the time of trial, Wolfe did not have any correct figures for the WC payment because the WC

12.

bureau was still auditing the account. Hall testified that the WC bureau conducts an audit of Job1 every year. She believed the payroll dollars were not correct on the original summary. Wolfe agreed that the payroll had been understated in the report to the WC bureau since 2008.

{¶ 24} Hackett also challenged numerous other expenses reported on the substituted summary on the basis that Job1 employees could not locate any supporting documentation for a portion of these expenses and some expenses conflicted with the general ledger. Hackett added the overstatement of each unsupported expense, and after deducting that amount from the total claimed expenses, he calculated there would have been a total gross profit for the five years of $837,823 ($297,526 for 2012; $149,179 for 2011; $212,618 for 2010; $71,251 for 2009; and $107,249 for 2008).

{¶ 25} Wolfe testified that these expenses were legitimate even if there was no supporting documentation. He could not explain the discrepancies without conducting an audit. Wolfe testified his accounting staff attempted to verify every expenses allocated to the Yamada account but were unable to completely do so, perhaps because not all of their records are segregated by client. Wolfe agreed that Hackett's totaling of the unverified costs is correct. The expenses Hackett questioned included the following expenses, which he summarized in an exhibit, but the court excluded it from evidence as duplicative of Hackett's testimony:

{¶ 26} 1.) An overstatement of $51,037.57 for the 2010 and 2011 payroll SUTA tax payments based upon the supporting documentation. Wolfe testified that he was

13.

certain the rate had changed in 2010, but he did not provide any updated information to correct Exhibit 8 supporting documentation.

{¶ 27} 2.) A total of $69,243.33 management fees for 2011 and 2012, Wolfe testified that his amount reflected a percentage share of billable staffing hours for two years in payment for his services rendered for Job1 under a contract between Job1 and Wolfe's management company to renegotiating a contract with Yamada in 2012 when Yamada began to increase production. Wolfe testified this negotiation did not relate to his CFO responsibilities at Job1. He had no documentation to substantiate his services but believes he would have submitted a bill to Rumpf.

{¶ 28} 3.) $5,265.89 of legal and account fees for 2012 paid to the attorney representing Job1 in this litigation. Job1 stipulated at trial that this charge should not have been included as an expense.

{¶ 29} 4.) $9,797.50 of 2012 employee screening costs were not verified by the supporting documentation.

{¶ 30} 5.) $1,499 of 2008 automotive expenses were not verified by the supporting documentation.

{¶ 31} 6.) $5,138.29 of the 2008 travel cost expenses were not verified by the supporting documentation.

{¶ 32} 7.) $3,737.47 of 2008 office supply expenses were not verified by the supporting documentation.

14.

**{¶ 33}** 8.)  $17,405 of 2008 outside services costs were not verified by the supporting documentation.

**{¶ 34}** 9.)  Wolfe testified the payroll staff expenses incorrectly included a deduction for staff in Bryan because this office did not conduct any services for the Yamada account and an expense for "drug test allocation."  While Wolfe agreed the "drug test allocation" should not have been included, it appeared that there were twelve entries with similar debit amounts and, therefore, he assumed the expense correctly reflected a monthly allocation of payroll staff costs even if the references were erroneous.

**{¶ 35}** In conclusion, Quest asserts that Job1 owed Quest $418,911 in gross profits under the PSA that were never disbursed because of the errors in the expenses allocated to the Yamada account, plus prejudgment interest of $52,137, for a total damage award of $471,048.

### Trial Court's Final Judgment

**{¶ 36}** On June 15, 2015, the trial court found that the PSA terminated November 2009 by the course and conduct of the parties:  The court found Job1 was circulating an in-house letter to terminate the contract because the two companies no longer had a working relationship and Quest had moved out of the Job1 building.  Therefore, the trial court found that Quest had failed to establish a breach of contract.

**{¶ 37}** With respect to the issues of the financial information, the court found Quest was not entitled to an accounting because Job1 provided Quest with all of the documentation and records available and the evidence establishes that there was only a

15.

profit in 2008.  The trial court found Quest never requested financial information from Job1 after November 2009 until the lawsuit was filed.  The court also found that Quest failed to demonstrate any malfeasance on the part of Job1 in maintaining accounting records.

{¶ 38} Finally, the trial court found that Quest failed to demonstrate that there were any errors in the accounting records of Job1 because it did not submit evidence by way of a forensic accountant.  The trial court found Quest failed to show the significance Hackett's simple arithmetic calculations had upon the gross profit calculations.  Quest appeals from the June 15, 2015 judgment.

### First Assignment of Error:  Manifest Weight

{¶ 39} Quest first argues that certain factual findings by the trial court were not supported by the evidence and, therefore, its decision was contrary to the manifest weight of the evidence.

{¶ 40} To establish a breach of contract, the plaintiff must establish "by a preponderance of the evidence that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure." *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, ¶ 77 (6th Dist.).  If the facts are undisputed and the only issue is whether a breach occurred, the matter is a question of law for the court to determine. *Id.*  Furthermore, "the right to literal compliance with contract provisions may be waived." *Daniel E. Terreri & Sons v. Bd. of Mahoning Cty. Commrs.*, 152 Ohio App.3d 95,

16.

2003-Ohio-1227, ¶ 77 (7th Dist.). *See also Conold v. Stern*, 138 Ohio St. 352, 359, 35 N.E.2d 133 (1941); *Hausser & Taylor, LLP v. Accelerated Sys. Integration, Inc.,* 8th Dist. Cuyahoga No. 84748, 2005-Ohio-1017, ¶ 18. Waiver can be express or implied from the conduct of the parties, but it must be intentional. *List & Son Co. v. Chase*, 80 Ohio St. 42, 51, 88 N.E. 120 (1909).

{¶ 41} A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the judgment than not. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17; *State v. Thompkins*, 78 Ohio St.3d 380, 386-390, 678 N.E.2d 541 (1997). When weighing the evidence, the court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider the weight of the evidence, and consider the credibility of the witnesses to determine if "the jury clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984) (citation omitted).

17.

{¶ 42} Quest challenges the following factual findings by the trial court:

{¶ 43} 1.) Intrater never requested financial data after November 2009 until this lawsuit was filed. Conflicting evidence was presented on this issue, which the trial court resolved. We cannot find that this finding was contrary to the manifest weight of the evidence.

{¶ 44} 2.) Rumpf sought to terminate the PSA because Job1 was not making any money under the PSA. This factual finding is supported by the manifest weight of the evidence but has little significance.

{¶ 45} 3.) Wolfe never changed any of Kelly's financial data for years 2008 and 2009. We find this finding of fact is contrary to the manifest weight of the evidence. Wolfe testified that he did prepare the first financial reports from the point where Kelly left off. However, we find there was undisputed evidence from Wolfe's testimony that he added a 3 percent of sales expense to the years 2009 through 2012, which Kelly did not include in 2008, and that he later revised the 2008 figures to include this cost as well. Therefore, this factual finding was not supported by the evidence.

{¶ 46} 4.) Quest moved out of the Job1 offices in November 2009 and never established another location for its business. Quest challenges this factual finding solely on the ground it is not relevant to the issue of whether the PSA was terminated. Therefore, we will address this factual finding under the second assignment of error.

{¶ 47} 5.) Based on the facts and the conduct of the parties, the PSA was terminated as of November 2009. We find this factual finding was contrary to the

18.

manifest weight of the evidence. Job1 was considering its option to terminate the contract. However, there is no evidence anyone at Job1 ever communicated that fact to Quest. A unilateral decision to terminate a contract does not terminate the contract. Furthermore, there was nothing Quest had to do in order to continue the contract. We find the trial court's finding that the PSA terminated in 2009 based on the conduct of the parties was contrary to the manifest weight of the evidence.

{¶ 48} 6.) The PSA resulted in no financial gain to Job1. We find this factual finding is contrary to the manifest weight of the evidence. Hackett presented numerous discrepancies in the accounting records which would have supported a finding that a profit had been generated under the PSA.

{¶ 49} 7.) The three-percent add-on cost was properly charged against income because the PSA did not specifically exclude it. This is really a question of law and not a manifest weight issue. The construction of a written contract is a question of law. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus. Ordinary words in a written contract must be "given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* at paragraph two of the syllabus. In this case the term "direct expenses" was explained parenthetically. But, because the term was not expressly limited to a meaning determined by the parties, the court was required to give the term its generally-accepted accounting definition and parol evidence of the intended meaning of the parties should not have been

19.

admitted.  The only evidence presented in this case as to the generally-accepted accounting definition of the term came from the testimony of Wolfe, who testified that the three-percent of sales add on expense was the proper method of determining direct expenses to be deducted from gross profit .  Therefore, we conclude that the three-percent add-on expense was justified.

{¶ 50} 8.)  The claimed expenses illustrate the PSA was not profitable.  We find this factual finding was contrary to the manifest weight of the evidence.

{¶ 51} 9.)  The fact that the expenses cannot be verified does not mean that they were inaccurate or false.  While we find this conclusion to be true, it is irrelevant in this case.

{¶ 52} We find the evidence is undisputed that there was a significant error either in the WC rate, WC payments, or WC cost allocation.  There was also undisputed evidence that not all of the claimed expenses had supporting documentation.  We agree with the trial court that the inability of Job1 to support each expense with documentation does not necessarily mean the expense was erroneous.  However, Job1 had a duty under the PSA to keep financial records to support the gross profit calculation.  Furthermore, Job1 had the burden in discovery to provide accurate financial data.  Wolfe testified some of the figures appeared to be correct even though there were flaws in the documentation or entry information.  However, he admitted that he did not know if the figures were correct because he had never audited the financial information before preparing the discovery information.

20.

{¶ 53} Because Job1 had not complied with discovery requests for accurate financial information, Quest was unable to refute the income summary. While Quest had the duty to establish whether there was actually a gross profit earned for the years involved in this case, Job1 had a duty under the discovery rules to supply Quest with the information needed to make the calculation of gross profit. Because Job1 failed to supply the requested discovery, and did not disclose until trial that the financial information previously supplied contained errors that could not be explained, we find the trial court's dismissal of appellant's case was contrary to the manifest weight of the evidence. The trial court's finding that no gross profit was realized for 2009-2012 was unsupported by the manifest weight of the evidence.

{¶ 54} 10) Quest failed to establish the errors in the income statement without forensic accounting evidence. We find this factual finding was contrary to the manifest weight of the evidence.

{¶ 55} The plaintiff has the burden of proving the amount of their damage with reasonable certainty. *Eckel v. Bowling Green State Univ*., 2012-Ohio-3164, 974 N.E.2d 754 ¶ 59 (10th Dist.). Damages must be proven with "sufficient evidence to show entitlement to damages in an amount which can be ascertained with reasonable certainty." *James v. Sky Bank*, 11th Dist. Trumbull No. 2010-T-0116, 2012-Ohio-3883, ¶ 33. If an issue can be determined from the ordinary knowledge and experience of laymen, expert testimony is not required. *State v. Maupin*, 42 Ohio St.2d 473, 479, 330 N.E.2d 708 (1975). "It is within the sound discretion of the state's judiciary, on a case by

21.

case basis, to decide whether such [expert] testimony is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue." *State v. Williams*, 4 Ohio St.3d 53, 446 N.E.2d 444 (1983), syllabus.

{¶ 56} In this case, there was nothing about the discrepancies in the income statement that required a forensic accountant to explain. The evidence is clear from Wolfe's testimony that there were errors in the WC calculations and that not all of the expenses had supporting documentation to ensure they were accurately assessed against the Yamada profit.

{¶ 57} Therefore, we find appellant's first assignment of error well-taken in part and not well-taken in part.

**Second Assignment of Error: Breach of Contract Claim**

{¶ 58} In its second assignment of error, Quest argues that the trial court erred when it found the breach of contract claim failed as a matter of law. The trial court concluded Quest had not proven its claim of breach of contract and rendered judgment in favor of Job1.

{¶ 59} To establish a breach of contract claim, the plaintiff must prove by a preponderance of the evidence: (1) there was a contract between the parties, (2) the plaintiff fully performed under the contract, (3) the defendant breached his obligation to perform under the contract, and (4) that economic damages resulted from the breach. *Gianetti v. Teakwood, Ltd.*, 10th Dist. Franklin No. 15AP-413, 2016-Ohio-213, ¶ 12;

22.

*Lawrence v. Lorain Cty. Community College*, 127 Ohio App.3d 546, 548-49, 713 N.E.2d 478 (9th Dist.1998).

{¶ 60} There is undisputed evidence in this case, and the trial court found, the parties entered into the PSA in September 2007. The agreement provided that the parties would coordinate their efforts in the referral staffing business for their mutual benefit. Job1 had the staffing capability and Quest had connections with several large companies that had staffing needs. No staffing referrals were required under the agreement. The PSA provided the agreement could be terminated at any time for good cause by giving 30 days' notice prior to termination. The term "good cause" was not defined by the contract and it was not discussed in negotiations. But, both Kelly and Hackett agreed that if the contract was no longer profitable, this fact would establish "good cause" for terminating the PSA. Nonetheless, the issue in this case was not whether there was good cause to terminate the contract in this case, but whether it was terminated.

{¶ 61} The PSA was a contract of indefinite duration but could be terminated at any time for good cause with notice 30 days prior to termination. Therefore, the contract could have been terminated orally or in writing. The trial court found the PSA was terminated by the course of conduct of the parties. We can find no case which supports a finding that a party's course of conduct can terminate a written contract. Apparently, the trial court determined that Quest's actions reflected an abandonment of the contract.

{¶ 62} We find these facts are insufficient to support a finding that the PSA was terminated in November 2009. First, there was no requirement under the contract that

23.

Quest operate its business out of the Job1 building. It was Job1 that leased the premises and prompted Quest's move. Kelly also testified the contract continued after Quest left the building. There was no evidence presented that Quest was dissolved as a business.

{¶ 63} Second, an internal discussion of termination of the PSA could never support a finding that the PSA was terminated because the evidence is undisputed in this case that Quest was never notified, in writing, of the termination of the PSA by Job1. Rumpf was the only witness who testified that he orally terminated the contract. However, he also testified that he hoped the relationship would continue after Quest vacated the Job1 building. He also could not identify the specific moment when he orally terminated the agreement. In any event Rumpf's basis for wanting to terminate the PSA is irrelevant to the issue of whether it was actually terminated. Whether Job1 was making money under the PSA or not, the contract remained in full force until it was actually terminated.

{¶ 64} Third, we find there was no requirement under the PSA that Quest make any additional referrals to Job1. It is clear from Rumpf's testimony that he anticipated the Yamada account would be a valuable account for Job1, and despite its challenges, remains a valuable client. Job1 paid Wolfe's company a fee to renegotiate the 2011 contract with Yamada. Even if the parties no longer worked together after November 2009, the PSA provided that the profits generated by the previously-referred client would continue so long as the referred client was supplied with staffing. The PSA did not require Quest to do any more work on the Yamada account in order to receive its half of

24.

the gross profits generated by the Yamada account. Quest did not have to do anything to make the contract continue.

{¶ 65} Finally, there was no requirement under the PSA that Quest request financial information. Even if the court found the evidence more credible that Quest never sought financial information after November 2009, it cannot be reasonably inferred from this fact that Quest intended to terminate the PSA. Both Intrater and Hackett testified that they accepted the determination by Job1 that there was no profit being generated under the PSA.

{¶ 66} The next issue involves whether there was a breach of the PSA by Job1's failure to share profits under the PSA. It is undisputed in this case that the PSA required the companies to share the profits generated by their arrangement. Furthermore, the PSA required both parties to maintain records pertaining to their PSA referrals and provide monthly summaries within 15 days after the month end.

{¶ 67} Based on the PSA language, we find the trial court's finding that Quest never requested accountings was irrelevant. The PSA required that Job1 provide monthly summaries or "accountings" to Quest. The evidence supports a finding that Job1 generally complied with this requirement until November 2009. There was no obligation under the contract that Quest request the financial information each month. While Intrater and Hackett testified they inquired about the profits from the Yamada account, they never specifically testified that they objected to the lack of monthly summaries. Because Quest did not complain about the lack of a monthly summary, we conclude they

25.

implicitly waived a claim of breach of contract on this basis.  But, waiver of the right to have a monthly statement in the past does not bar Quest from asserting its right to a monthly statement in the future or to seek a remedy of an accounting for breach of contract.  Therefore, we find that Quest was entitled to an accounting of the gross profits generated under the PSA.

{¶ 68} Quest attempted to establish a breach of the PSA, the failure to share gross profits, based on the financial information Job1 supplied in discovery.  The trial court found that Quest did not establish a breach of the PSA because Quest failed to prove by expert, forensic accounting evidence that there were any errors in the accounting, the significance of the impact the "simple arithmetic calculations had upon the gross profit calculations," and that Job1 committed malfeasance in maintaining accounting records.

{¶ 69} However, in this case, Job1 never provided accurate financial information in discovery so that the issue of damages could be calculated.  Quest specifically identified the numerous discrepancies reported in the five-year gross profit summary.  Even though Job1 had the obligation under the contract to maintain the records relating to the gross profit generated by the Yamada account, Job1 was unable to provide documenting support for each of the expenses claimed.  Even Wolfe testified that some of the figures were not correct and that he could not determine if the report was inaccurate without auditing the records.  Furthermore, as of the day of trial, Wolfe could not testify as to the accurate WC rate, payment, or cost allocation when all of the financial records were within his control.  An expert witness was not necessary to

26.

establish that Job1 did not supply Quest with accurate financial information and could not provide supporting documentation for each cost allocated to the account.

{¶ 70} Therefore, we find appellant's second assignment of error well-taken.

**Third Assignment of Error:  Award of Damages and Prejudgment Interest**

{¶ 71} In its third assignment of error, Quest argues the trial court erred when it failed to award Quest damages and prejudgment interest for Job1's breach of contract.

{¶ 72} We concluded the trial court erred when it found that Quest had failed to establish a breach of the PSA.  Because the trial court never reached the issue of the amount of damages Quest had proven, we find this issue premature and not well-taken. We remand this case to the trial court for a determination of damages based on the evidence presented.

{¶ 73} Having found the trial court did commit error prejudicial to appellant and that substantial justice has not been done, the judgment of the Lucas County Court of Common Pleas is reversed.  Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

Quest Workforce Solutions, LLC
v. Job1USA, Inc.
C.A. No. L-15-1189

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.     _____
               JUDGE

Arlene Singer, J.

             _____
Stephen A. Yarbrough, J.        JUDGE
CONCUR.

             _____
               JUDGE