**[Cite as *Hutchings v. Hutchings*, 2019-Ohio-5362.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

Charles R. Hutchings

     Appellee

v.

John Hutchings, Individually and as
Trustee of the Hutchings Family Trust

     Appellant

Court of Appeals No. S-19-008

Trial Court No. 20169001

**<u>DECISION AND JUDGMENT</u>**

Decided: December 27, 2019

* * * * *

Emmett E. Robinson, for appellant.

Jennifer J. Antonini, for appellee.

* * * * *

**ZMUDA, J.**

{¶ 1} This matter is before the court on appeal from the judgment of the Sandusky County Court of Common Pleas, Probate Division, following a jury trial. Because we find the verdict contrary to law and unsupported by the evidence, we reverse.

## I. Facts and Procedural Background

{¶ 2} The parties in this dispute are brothers, appellant John Hutchings and appellee Charles (Chip) Hutchings. Chip filed suit to challenge the distribution of trust assets, placed in an irrevocable trust by their father Charles Hutchings. Both Charles and his wife Elise Hutchings passed away in 2014, shortly after creation of the irrevocable trust.

{¶ 3} During Charles' and Elise's lives, John managed their finances. His parents chose him because he worked as a financial advisor and had the training, education, and experience to manage their affairs. Chip never objected to this arrangement, and even approved of John's efforts on their parents' behalf.

{¶ 4} In 2012, Elise exhibited signs of dementia, and Charles soon became her full-time caregiver. While Elise was still competent to do so, she and Charles executed durable power of attorney documents, granting John broad authority over his parents' affairs. The durable power of attorney revoked all prior financial powers of attorney, and granted John the authority to act in each parent's name and on their behalf in matters including real property transactions, banking, retirement transactions, fiduciary transactions, and estate, trust, and other beneficiary transactions.

{¶ 5} Relevant to this appeal, the durable power of attorney specifically provided John with authority with respect to amending or creating trusts, permitting John to "create a new revocable or irrevocable inter vivos trust, under whatever terms my attorney-in-fact deems advisable[.]" The durable power of attorney expressly permitted self-dealing,

2.

providing, "My Agent can enter into transactions with me or in my behalf in which my Agent is personally interested, notwithstanding any law prohibiting acts of self-dealing."

{¶ 6} Charles' attorney, Louis Borowicz, drafted the power of attorney documents after consulting with Charles by phone. Chip never challenged the validity of the power of attorney, or disputed the broad authority granted to John. Instead, Chip argued that John exceeded this broad authority by having a gift-balancing clause included in the otherwise proper irrevocable trust.

{¶ 7} Both sons received gifts and money from their parents throughout their adult lives, and Elise was a meticulous record-keeper. She tracked funds given to John and Chip, as well as any money received back as repayment on loans. Elise preserved her ledgers in a lock box, and John indicated she called the ledgers her "bread crumbs," intended for John's use in sorting out the estate when she and Charles were gone. By 2013, Elise's health and mental state had deteriorated, and she moved into a nursing home. At this point, Elise required more care than Charles was able to provide, and Charles became concerned about the cost of long-term nursing home care. Charles' health also began to fail at this time, and eventually he, too, required nursing home care.

{¶ 8} After speaking with his father, John consulted with Borowicz, who recommended an irrevocable trust. Borowicz did not speak with Charles regarding the trust, but John indicated he shared all details with his father. As part of preparations for the trust, John ran a credit report for his parents and discovered several student loans taken out by Chip's daughter, totaling around $100,000. All but one of these loans listed

3.

Charles as cosigner without Charles' knowledge or consent, and all were in default. Fearing Sallie Mae would attach assets of the estate, Borowicz recommended quick execution of the trust.[1] On August 12, 2013, John executed the irrevocable trust, drafted by Borowicz, on behalf of Charles as expressly authorized by the power of attorney. Borowicz directed John to execute the trust on his father's behalf to avoid delay, because Charles lived a distance from Borowicz's office.

{¶ 9} The new trust identified John and Chip as beneficiaries, but unlike prior estate plans, included a gift-balancing clause, requiring offset of any distribution after the death of both parents, according to amounts already given to John or Chip during their parents' lifetimes. Both John and Chip were aware of gifts and money received by the other, but there was no evidence that either knew the exact amounts each had received, prior to execution of the trust. Borowicz indicated this clause was standard where there have been lifetime gifts given to the beneficiaries. Chip argued this new provision did not reflect his parents' intent, but did not otherwise seek to void the trust. Chip also never claimed that John exerted undue influence over their father.

{¶ 10} The terms of the irrevocable trust designated John as trustee, and granted him the authority to make distributions of principal and interest, during the lifetimes of Charles and Elise, with "absolute discretion." As trustee, John could make these

---

[1] The forged student loans are not at issue in this appeal.

discretionary distributions to himself, to Chip, and to his father's financial advisor.[2] At trial, John testified that the goal of the irrevocable trust was, first, to take care of his parents, who were expending large sums each month for nursing home care. As structured, John indicated the trust assets would have depleted over time had his parents lived longer, taking them through the Medicaid look-back period. A second goal of the trust was creditor protection, and John testified that the surprise of the student loan debt acted as an impetus for quick execution of the documents. Based on the evidence and testimony, John authorized distributions of both income and principal, as expressly permitted, to care for his parents until they passed away.

{¶ 11} Chip asserted no claim based on distributions, during his parents' lifetime. Chip, furthermore, did not dispute the authority granted to John as trustee, to make distributions while their parents lived, solely at John's discretion. Chip also cited no provision within the trust language that granted him ownership or a right to possession of trust assets, prior to the deaths of both parents. Instead, the trust provided for distribution after death, as follows:

> **3.1.** ***Distributions following the Death of the Survivor.***
>
> Upon the death of the second to die of my spouse and me, all of the remaining principal and accumulated income, if any, of this Trust shall be

---

[2] At the time John executed the trust, he had retired from the financial advising business, and his stepson, Mark Lieser, also a financial advisor, had succeeded him in his business and in his duties in managing his parents' investments.

divided into as many shares, allocated as hereinafter provided, as are necessary to provide one such share for each then living child of mine.

    *3.1.1.  Funding Each Child's Trust Share*. The Trustee shall fund such separate shares so as to provide as nearly equal shares as practicable after crediting to the value of such separate shares the amount of all gifts made by the Grantor to, or for the benefit of, the beneficiaries of each such separate share, or to, or the benefit of, the spouse or descendant of any such beneficiary. It is the Grantor's intention that the family units represented by such separate shares be treated equally by aggregating all such gifts to the members of such family units as provided above and allocating the amounts used to fund the separate shares hereunder, so that the total amount of funds benefiting each family unit will be as nearly equal as is reasonably practicable. In making such allocations, the Grantor expressly realizes that a share or shares may not be funded to any extent hereunder.

{¶ 12} On August 22, 2013, days after execution of the irrevocable trust, Charles personally conveyed his assets into the trust by executing and recording a deed and memorandum and affidavit of trust to convey his home from the prior revocable trust to the newly created irrevocable trust.

{¶ 13} Within a year of executing the irrevocable trust, Charles and Elise passed away, Charles on May 18, 2014, and Elise on July 27, 2014. John, as trustee, sold the home and personal property, and used Elise's ledgers to conduct the gift balancing. John

6.

sent a detailed spreadsheet to Chip containing the results of his calculations. Based on Elise's records, both brothers received substantial lifetime gifts, but Chip and his family received the larger share. John calculated lifetime gifts to Chip and his family totaling over $400,000, and lifetime gifts to himself and his family totaling nearly $120,000. The proceeds from the trust, however, only totaled around $300,000. After gift balancing, Chip received no funds in distribution from the trust.

{¶ 14} Chip filed suit, seeking to void only the gift-balancing provision of the trust, and alleged claims for an accounting, conversion, and unjust enrichment. Chip also sought declaratory judgment regarding proper division of the trust proceeds. Additionally, Chip requested punitive damages for John's alleged malice in denying him his inheritance. The matter proceeded to trial, with Chip prosecuting only his claim for conversion, seeking compensatory and punitive damages.

{¶ 15} Chip's complaint for conversion alleged as follows:

> Upon information and belief, the original estate plan of Charles and Elise Hutchings provided for equal distribution of the residuary of their assets;

> By inserting a "gifting clause" into the irrevocable trust, John purposely intended to and in fact did, utilize such "gifting clause" to make the claim that Chip was not entitled to his share of trust assets;

> The gifting clause was invalid as it was not within the 1999 trust, and as such, was not the intention of Charles and Elise Hutchings;

7.

John's wrongful action has resulted in his conversion of Chip's share of the inheritance to himself;

As a result of John's conversion of Chip's inheritance, Chip has been damaged in an amount in excess of twenty five thousand dollars ($25,000.00).

{¶ 16} A jury heard the conversion claim. In support of his claim, Chip provided his own testimony. John and attorney Borowicz testified for the defense. The parties largely stipulated as to the exhibits, which included the durable power of attorney, prior wills, the earlier revocable trust, the irrevocable trust agreement, and John's gift-balancing spreadsheet.

{¶ 17} After a three-day trial, the jury returned a verdict in favor of Chip, and awarded him half of the remaining trust assets as compensatory damages for conversion. The jury also found John was liable for punitive damages and attorney fees. The trial court denied John's motion for judgment notwithstanding the verdict, and this appeal followed, with John asserting the following assignments of error:

1. The trial court's judgment in plaintiff's favor on the conversion claim was contrary to law and against the manifest weight of the evidence because plaintiff did not own or have a possessory interest in tangible personal property at the time of the alleged conversion.

2. The trial court reversibly erred by applying the wrong burden and standard of proof to plaintiff's conversion claim.

8.

3. The trial court reversibly erred by applying a great-weight-of-the-evidence standard to plaintiff's claim for punitive damages.

4. Even discounting all of the aforementioned errors, the trial court's judgment was contrary to the manifest weight of the evidence.

## II. Standard of Review

{¶ 18} John challenges the verdict as contrary to law and against the manifest weight of the evidence, while also challenging the trial court's application of the law regarding the standard of proof for conversion and evidence of punitive damages.

{¶ 19} To prevail on a claim of conversion, the plaintiff bears the burden of proving all the elements necessary to sustain that claim by a preponderance of the evidence. *J.B. Walter Const. Inc. v. Futronics, Inc.*, 6th Dist. Lucas No. L-99-1080, 2000 WL 5911, *2 (Jan. 7, 2000), citing *Joyce v. General Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990); *Zacchini v. Scripps-Howard Broadcasting Co.*, 47 Ohio St.2d 224, 226, 351 N.E.2d 454 (1976). An award of punitive damages, however, requires proof by the plaintiff of entitlement to punitive damages by clear and convincing evidence. *Whetstone v. Binner*, 146 Ohio St.3d 395, 2016-Ohio-1006, 57 N.E.3d 1111, ¶ 20, citing R.C. 2315.21(D)(4).

{¶ 20} A judgment is insufficient and contrary to law where the evidence is not legally sufficient to sustain the verdict. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 11, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). Even if there is

9.

sufficient evidence to sustain a judgment, we may still find that the judgment is against the manifest weight of the evidence. *Eastley* at ¶ 12. In reviewing a challenge to the manifest weight of the evidence, we must determine "whether the greater amount of credible evidence was admitted to support the judgment than not." *Quest Workforce Solutions, LLC v. Johb1USA, Inc.*, 75 N.E.3d 1020, 2016-Ohio-8380, ¶ 41 (6th Dist.), citing *Eastley* at ¶ 17; *Thompkins* at 386-390.

### III. Analysis

{¶ 21} In his first assignment of error, John argues that the judgment was contrary to law and against the manifest weight of the evidence because Chip did not own or have possession of any trust assets at the time of the alleged conversion. In his second assignment of error, John argues the trial court erred by applying the wrong burden and standard of proof to plaintiff's conversion claim. Because these assignments of error both concern the requirements for sustaining a claim of conversion, we address them together.

{¶ 22} The parties disputed when the conversion occurred, with John characterizing Chip's theory as conversion by execution of the trust, and Chip arguing conversion beginning with execution of the trust and continuing through the time of distribution, according to the gift-balancing provision included in the trust.

{¶ 23} Chip abandoned all but his conversion claim at trial, and sought to prove the "gift-balancing" provision invalid through conversion. The essential elements of a conversion claim are (1) ownership or right to possession of the property at the time of

10.

conversion, (2) a wrongful act or disposition of that property right by the defendant, and (3) damages. (Citations omitted.) *Peirce v. Szymanski*, 6th Dist. Lucas No. L-11-1298, 2013-Ohio-205, ¶ 19.

{¶ 24} After considering the evidence, the jury answered interrogatories, finding John did not act appropriately in executing the trust, and that this conduct resulted in conversion of Chip's property. Specifically, the jury answered the following question in the negative: "Do you find * * * that [John] appropriately acted within his fiduciary duty in executing the August 12, 2013 Hutchings Family Irrevocable Trust, on behalf of his father, using the power of attorney?" The jury then awarded Chip half of the trust assets, or distribution without application of the gift-balancing provision.

{¶ 25} In order to demonstrate conversion, however, Chip needed to demonstrate possession or ownership of trust assets. *Peirce* at ¶ 19. The terms of the trust, and specifically, the gift-balancing provision, prevented Chip from attaining ownership of assets. Therefore, Chip sought to invalidate only the gift-balancing provision by arguing John breached a fiduciary duty in executing the irrevocable trust.[3] Significantly, Chip

---

[3] While neither party raises the issue of "partial invalidity" of the trust, courts will strike a provision, while preserving the trust, where that provision could not have legal effect as a matter of law. *See, e.g., Gwinner v. Schoeny,* 111 Ohio App. 177, 185, 171 N.E.2d 728 (1st Dist.1960) (finding the Rule against Perpetuities invalidated some aspects of the trust, but did not otherwise require setting the entire trust aside); *Sawyer v. Lebanon Citizens Natl. Bank,* 105 Ohio App.3d 464, 468, 665 N.E.2d 571 (12th Dist.1995) ("court did not have authority pursuant to R.C. 2125.03(A)(2) to order the children's trust funds conveyed to Favaron's next of kin if both children died without issue before reaching age twenty-five, and we find that provision in the trust agreement invalid.").

11.

challenged John's conduct while also accepting the durable power of attorney, in its entirety, as valid and proper.

{¶ 26} "A power of attorney is a written instrument authorizing an agent to perform specific acts on behalf of his principal." (Citation omitted.) *Testa v. Roberts*, 44 Ohio App.3d 161, 164, 542 N.E.2d 654 (6th Dist.1988). The unchallenged durable power of attorney specifically authorized John to "create a new revocable or irrevocable inter vivos trust, under whatever terms my attorney-in-fact deems advisable[.]" The durable power of attorney expressly granted authority for this specific action, pursuant to R.C. 1337.42(A).

{¶ 27} Despite this explicitly granted authority, Chip argued that John's conduct in executing the trust with a gift-balancing provision exceeded this authority. At the same time, in the factual allegations of his pleading, Chip acknowledged John's authority, as authorized by the durable power of attorney, stating:

> On or around August 12, 2013, John executed the Hutchings Family
> Irrevocable Trust Agreement, u/a/d August 12, 2013, on behalf of
> Charles F. Hutchings, alleged Grantor, by way of John's power of attorney.
> (See attached Exhibit A)  **Said power of attorney authorized John to**
> **initiate and execute an irrevocable trust**. (Emphasis added.)

There is no dispute, therefore, that the durable power of attorney expressly granted John the authority to execute an irrevocable trust. To challenge only the gift-balancing

provision, Chip maintained that John wrongfully exceeded the powers granted, ignoring the comprehensive scope of authority actually given to John.

{¶ 28} Clearly, without the express authority to self-deal, any transfer of assets using a power of attorney would be presumptively invalid. *MacEwen v. Jordan,* 1st Dist. Hamilton No. C-020431, 2003-Ohio-1547, ¶ 13 -14. With the comprehensive and express grant of authority to John, however, the presumption of invalidity, based on self-dealing, did not arise in this case. *In re Buckner*, 12th Dist. Clermont No. CA2008-07-074, 2009-Ohio-2447, ¶ 26, citing *MacEwen* at ¶ 11, 14. Furthermore, Chip's argument of wrongful conduct—the use of authority specifically granted within the durable power of attorney—is irreconcilable with Chip's acknowledgment that the durable power of attorney was proper and authorized that same exercise of authority.

{¶ 29} Because John had express authority to execute the irrevocable trust, including any terms he deemed appropriate, and no evidence demonstrated wrongful conduct in execution of the irrevocable trust, John's exercise of authority was facially valid. Thus, Chip bore the burden of demonstrating undue influence, by clear and convincing evidence, in order to demonstrate an invalid exercise of authority as to the gift-balancing provision. (Citation omitted.) *MacEwen* at ¶ 13. Instead, the evidence adduced at trial demonstrated (1) an unchallenged durable power of attorney, (2) used to execute the irrevocable trust containing terms that were consistent with prior estate plans but for the gift-balancing clause, (3) that provided John with absolute discretion over distributions while Charles and Elise lived, and (4) required gift-balancing prior to

13.

distribution after they died. Chip presented no evidence of undue influence, and on appeal, maintained that the issue of undue influence was irrelevant and unnecessary.

{¶ 30} Chip's theory of conversion depended on the contradictory position that John's authorized use of proper authority was presumptively improper, with no further facts necessary regarding John's conduct. Instead, Chip relied on John's distribution after gift-balancing as the wrongdoing, which John performed in conformity with the terms of the trust. With no evidence, however, of undue influence or other wrongful conduct, John's inclusion of the gift-balancing provision was expressly authorized, and the distribution not wrongful.

{¶ 31} Because Chip failed to demonstrate invalidity in a properly executed trust, and application of the gift-balancing provision resulted in Chip receiving no funds from the estate,[4] we find no evidence that Chip owned or possessed trust assets. As this was a necessary element for a conversion claim, we find the first and second assignments of error well-taken. Resolution of these assignments of error render John's fourth assignment of error moot.

{¶ 32} In his third assignment of error, John argues that the trial court applied an incorrect standard to Chip's claim for punitive damages. However, based on our finding as to the lack of evidence on an essential element of the conversion claim, this

---

[4] The trust contemplated this potential result, with language regarding distribution, after second death, providing, "the Grantor expressly realizes that a share or shares may not be funded to any extent hereunder."

14.

assignment of error is also moot. It is well-settled law that punitive damages "arise incident to compensable harm" and are recoverable only when compensatory damages are awarded. *Whetstone,* 146 Ohio St.3d 395, 2016-Ohio-1006, 57 N.E.3d 1111 at ¶ 20, citing *Niskanen v. Giant Eagle, Inc.,* 122 Ohio St.3d 486, 2009-Ohio-3626, 912 N.E.2d 595, ¶ 12-13; R.C. 2315.21(C)(1). Finding no basis for judgment on the claim or for compensable damages, therefore, there could be no punitive damages awarded in this matter.

## IV. Conclusion

{¶ 33} For the forgoing reasons, we reverse the judgment of the Sandusky County Court of Common Pleas, Probate Division, and enter judgment in favor of appellant as to the claim for conversion. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.