[Cite as *E.G. Licata, L.L.C. v. E.G.L., Inc.*, 2018-Ohio-2032.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

E.G. Licata, LLC

    Appellee

v.

E.G.L., Inc.

    Appellant

Court of Appeals No. L-17-1124
L-17-1125

Trial Court No. CVG-16-06313
CVG-16-06312

**DECISION AND JUDGMENT**

Decided: May 25, 2018

* * * * *

James S. Nowak, for appellee.

Ronald A. Skingle, for appellant.

* * * * *

**OSOWIK, J.**

**Introduction**

{¶ 1} These consolidated cases present a dispute over the amount of damages imposed by the Toledo Municipal Court, Housing Division, in favor of the plaintiff-landlord, E.G. Licata, LLC and against the defendant-tenant, E.G.L., Inc. The tenant operated two retail businesses on properties it leased from the landlord, both in Toledo,

Ohio. When the tenant stopped paying the full amount of its monthly rental obligation, in protest for the landlord's failure to make capital improvements, the landlord filed two forcible entry and detainer actions. The parties resolved the dispute except as to the issue of damages. Following a bench trial, the trial court ordered the tenant to pay the landlord the full amount of back rent and unpaid taxes, approximately $120,000 plus interest, plus a $5,000 sanction for failing to comply with a previous court order. The tenant appealed. For the reasons set forth below, we affirm.

## Facts and Procedural History

{¶ 2} The following evidence was offered at trial. In 1984, the tenant bought two retail businesses from Ernest G. Licata and his then-wife, Andrea E. Licata. The businesses were defined as "sexually-oriented businesses," under Chapter 767 of the Toledo Municipal Code. One of the stores was located on Reynolds Road, and the other was on Telegraph Road, both in the city of Toledo. The sellers sold only the businesses, not the real property where the stores were located. The sellers then leased the property to the tenant in two separate leases, both dated June 8, 1984, for a period of five years. Since then, the parties have extended the lease multiple times, although the ownership of the premises has changed twice over the years. That is, in 2005, Ernest G. Licata died. At that time, he was remarried to Lynn L. Licata. Upon his death, ownership of the properties passed to the Ernest G. Licata Trust, and the co-trustees were his widow, Lynn, and his son, Troy Licata. The Ernest G. Licata Trust leased the properties to the tenant for many years, including its most recent, five year extension, dated July 16, 2014. As with all the other lease extensions, it specifically incorporated the original agreement.

2.

Also, one month after the parties extended the lease, the trust that owned the premises was dissolved, and ownership of the property was transferred to E.G. Licata, LLC, of which Lynn and Troy were the members. There is no dispute as to the enforceability of the prior agreements as to the landlord.

{¶ 3} The Reynolds Road and Telegraph Road lease agreements are nearly identical, except for the rental amounts. Both agreements called for the tenant to pay the property taxes, utilities, and costs of insurance. They also required the tenant to "to make all repairs of the premises" and to keep the premises in "good repair." In the most recent lease extension, the tenant agreed to pay $2,040.99 per month for the Reynolds Road property and $3,091.62 for the Telegraph Road property.

{¶ 4} At the hearing, the landlord called no witnesses during its case in chief, relying entirely on its exhibits to establish the amount of damages it sustained as a result of the tenant's breach. The tenant called Lynn Licata on cross-examination. Lynn testified that she lives in another state, has never been inside either property, and left all communications with the tenant to her step-son, Troy. Lynn and Troy divided the monthly rental proceeds; none of the money was "invested" back into the property or set aside for any purpose. Licata denied that the landlord ever paid for a capital improvement to either property. Similarly, she denied funding any repairs, with the exception of a $1,000 foundation repair to the Reynold's Road property. Licata paid Troy to perform that job.

{¶ 5} Chad Thompson has served as the tenant's property manager since 1988. Thompson testified that the tenant "consistently" maintained the properties, as required

3.

under the leases. He cited examples such as routine maintenance on the heating, ventilation, air conditioning (HVAC) systems, patching parking lots, repairing rooftops and other "general tenant responsibilities."

{¶ 6} According to Thompson, the landlord was responsible to make capital improvements to the properties, but he could not recall a time that it ever did so. Therefore, before 2010, if the premises required the type of work that the landlord was contractually responsible to provide, the tenant would pay for the work to be performed and then deduct its expense from its monthly rental payment. Thompson "started to enforce the lease in 2010" and discontinued fronting capital improvement expenses. Thompson explained that the tenant could no longer afford to "bankroll the capital improvements anymore," and both buildings fell into serious disrepair. Thompson testified that, "everything has a life cycle. So the roof, the parking lot, the structural components of the building, the soffits, the electrical components and fixtures, everything has fallen into disrepair and it's no longer repairable. All the life cycles have ended." As an example, Thompson said that both buildings were infested with pests and rodents because the roofs had not been properly kept up over the years and were no longer repairable, despite the tenant's efforts to extend their lives with patches. Thompson raised the issue of capital improvements "in every conversation [he had with the landlord] * * * for the past five * * * years" but no agreement was reached. He blamed the absence of an agreement on the fact that Lynn and Troy, as landlords, "couldn't agree

4.

on anything." Although the issue remained "unresolved" at the time the parties negotiated the July, 2014 extension to the lease, Thompson agreed to another five year term.

{¶ 7} In August of 2015, the tenant unilaterally decided to reduce its rental payment, at each location, "to reflect the current condition of the property." Thompson said the decision was made "to reflect the capital improvements that were not being done." It decided to pay $1,525 for each property.

{¶ 8} After accepting three months of partial payments, the landlord refused to accept anymore, beginning in November of 2015. On April 29, 2016, it filed complaints for restitution of the properties and damages. The tenant counterclaimed, alleging, in part, that the landlord had breached an agreement to make capital improvements. During a pretrial conference, the parties reached a partial settlement whereby the tenant agreed to vacate the properties by March 15, 2017, and to dismiss its counterclaims. The parties also agreed that the court would hold a damages assessment hearing on the landlord's claims for back rent and unpaid property taxes and that the tenant would be able to raise any setoffs it was entitled to.

{¶ 9} On April 19, 2017, following a hearing, the trial court awarded the landlord $48,258.49 in damages as to the Reynolds Road property ($39,799.32 in past due rent and $8,459.17 in unpaid property taxes) and $72,434.28 in damages as to the Telegraph Road property ($60,349.02 in rent and $12,085.26 in taxes). The court denied the tenant's request to reduce the awards by $42,358.96 (Telegraph) and $14,671.55 (Reynolds Road) in repair costs because it found that such costs were the tenant's

5.

responsibility. It also ordered the tenant to pay the landlord an additional $5,000 contempt-of-court sanction for failing to abide by a previous order to place disputed rental amounts into an escrow fund.[1] The total judgment in the landlord's favor was $125,692.77.

{¶ 10} The tenant appealed and raises one assignment of error for our review:

{¶ 11} The trial court erred by awarding judgment against appellant for breaching two lease agreements because appellee failed to prove by a preponderance of evidence that it substantially performed all of its contractual obligations.

## Law and Analysis

{¶ 12} In an appeal from a civil bench trial, we generally review the trial court's judgment under a manifest-weight standard of review. *United States Fire Ins. v. Am. Bonding Co.*, 1st Dist. Hamilton Nos. C-160307 & C-160317, 2016-Ohio-7968, ¶ 16-17. We weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment

---

[1] On October 11, 2016, the trial court found the tenant in contempt for failing to comply with a previous order to deposit all past due rent and property taxes into escrow. It sanctioned the tenant, at a rate of $1,000 per week, until it complied. The tenant appealed the order of contempt and, by separate motion, requested a stay. We granted the stay, on the condition that the tenant deposit approximately $84,000 with the clerk of the Toledo Municipal Court. *E.G. Licata LLC v. E.G.L., Inc.,* 6th Dist. Lucas Nos. L-16-1244; L-16-1245 (Dec. 9, 2016). According to the trial court's April 19, 2017 judgment in favor of the landlord, the tenant never placed any monies into escrow.

must be reversed and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. Where, however, the trial court's judgment is based upon a question of law, we review the trial court's determination of that issue de novo. *See Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 34; *see also Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984) (holding that a finding of an error of law is a legitimate ground for reversal).

{¶ 13} Here, the tenant does not specifically address (or appear to challenge) the trial court's calculation of unpaid rent and property taxes. Instead, the tenant seeks reversal of the lower court's judgment "in the amount of $125,692.77," with a corresponding order that we "enter judgment in [its] favor." We interpret the tenant's prayer for relief as a request to offset fully the damages award. We note, however, that the tenant proferred, at most, $57,030.51 in expenses at trial, i.e. far less than the amount of the judgment.

{¶ 14} In any event, the gist of the tenant's case is that, pursuant to Paragraph 17 of the leases, the landlord was "required to make all **capital improvements, repairs, additions and alterations** which were necessary for the safety, preservation or improvement of the Leased Premises." (Emphasis added). The tenant complains that the landlord "consistently ignored their responsibilities" for "almost thirty-two (32) years."

{¶ 15} We begin with Paragraph 17 of the lease agreements. It provides,

> That said [tenant] will permit said [landlord] and the agents of said [landlord] to enter upon said premises at all reasonable times, to examine

7.

the condition thereof, or make such **repairs, additions or alterations** therein as may be necessary for the safety, preservation or improvement, thereof, and of said building, or to exhibit the same.  (Emphasis added.)

{¶ 16} Leases are contracts subject to the traditional rules of contract interpretation.  *Mark-It Place Foods v. New Plan Excel Realty Trust, Inc.*, 156 Ohio App.3d 65, 2004-Ohio-411, 804 N.E.2d 979, ¶ 29 (4th Dist).  The interpretation and construction of a written contract is a question of law and, therefore, appellate courts will review de novo the trial court's interpretation of a contract.  *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502, 660 N.E.2d 431 (1996).   The purpose of contract construction is to discover and effectuate the intent of the parties.  *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9. The intent of the parties is presumed to reside in the language they chose to use in their agreement.  *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132, 509 N.E.2d 411 (1987).  If the terms of the contract are determined to be clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the parties' rights and obligations.  *Davis v. Loopco Indus., Inc.*, 66 Ohio St.3d 64, 66, 609 N.E.2d 144 (1993); *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146 (1978).

{¶ 17} Paragraph 17 makes no reference to "capital improvements," despite the tenant's tacking on of that term to "**repairs, additions or alterations**," which are included therein.  Moreover, the tenant does not define the term "capital improvement."  *Black's Law Dictionary* (3d Ed.1990) defines "improvement" as "a valuable edition made to property (usually real estate) * * * amounting to more than mere repairs or replacement,

8.

costing labor or capitol, and intended to enhance its value, beauty or utility * * *." Thus, a "capital improvement" is distinguishable from a repair. Therefore, we find that the landlord's promise in Paragraph 17 to "make such repairs, additions or alterations" cannot be said to include a promise to make capital improvements. Moreover, Lynn and Troy Licata testified that the landlord never promised to make, and in fact, never made any capital improvements. Finally, even the tenant agrees that the issue was "unresolved" at the time the parties renegotiated the lease in 2014. We find a total absence of any evidence indicating that the parties intended to contractually bind the landlord to make capital improvements. In that sense, the leases are clear and unambiguous.

{¶ 18} Although the tenant frames this case as one involving the landlord's failure to make capital improvements, the expenditures cited by the tenant all fall under the category of repairs. When asked to identify an example of a capital improvement that the landlord should have paid for, Thompson identified the 2015 replacement of the Telegraph Road HVAC unit, which cost $6,000. Thompson testified that the tenant also had to bear additional "repair costs," such as patching rooftops, due to the landlord's failure to make the capital investment of replacing the roof. The trial court found that the various expenses, such as the HVAC replacement, septic tank maintenance, pest control service fees, and miscellaneous fees from a general "handyman" (totaling about $57,000) were for "repairs," not capital improvements. "[A]n appellate court gives due deference to the trial court's findings of fact, so long as they are supported by competent, credible evidence." *The Four Howards, Ltd. v. J & F Wenz Road Investment, L.L.C*, 179 Ohio

9.

App.3d 399, 2008-Ohio-6174, 902 N.E.2d 63, ¶ 63 (6th Dist.). We agree with the trial court's findings, and we add that neither the replacement of an HVAC system, nor a roof, constitutes a "valuable edition * * * but rather [is a] mere repair or replacement" and thus does not fit within the definition of a capital improvement.

{¶ 19} Moreover, the tenant agrees that it was responsible for routine maintenance and repairs to the properties. Indeed, Paragraph 5 provides,

> That said [tenant] will make all **repairs** of the premises hereby leased and will indemnify and save harmless said [landlord] from and against all liens, claims and damages by reason of any **repairs or improvements** which may be made by said [tenant] on said premises. (Emphasis added.)

{¶ 20} Likewise, Paragraph 11 requires the tenant to "keep said premises, and all parts thereof, and all fixtures, machinery and apparatus, in good repair and in such condition that no damage will occur to any person by reason thereof." Although the landlord also agreed to make "repairs * * * as may be necessary for the safety, preservation or improvement" of the properties, its duty to do so was subject to the tenant's duty to make "all repairs." And, as stated, the tenant's theory is not that the landlord breached a duty to make repairs, but rather, to make capital improvements. We find that, under paragraph 5 of the agreement, the tenant was responsible for the repair expenses at issue in this case.

{¶ 21} Finally, while the tenant argues that it was constructively prevented from relocating its businesses, given the prohibitive zoning rules applicable to sexually

10.

oriented businesses, Thompson admitted that nothing prevented the tenant from rejecting the terms of the July, 2014 lease and moving to a different location.

{¶ 22} The tenant has put forth no legal argument that either lease required the landlord to make capital improvements and/or that the specific costs incurred by the tenant in this case should have been paid for by the landlord. Therefore, we find that the tenant-appellant is not entitled to offset any amount against the judgment of $125, 692.77, plus interest, in the landlord-appellee's favor. Accordingly, the tenant's assignment of error is not well-taken. On consideration whereof, this court finds that substantial justice has been done to the tenant, and the April 19, 2017 judgment of the Toledo Muncipal Court, Housing Division is affirmed, at appellant's costs.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                           _____
                                                              JUDGE
Thomas J. Osowik, J.

James D. Jensen, J.                        _____
CONCUR.                                                   JUDGE

                                           _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.