[Cite as *Quest Workforce Solutions, L.L.C. v. Job 1USA, Inc.*, 2018-Ohio-3304.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Quest Workforce Solutions, LLC

    Appellee

v.

Job1USA, Inc.

    Appellant

Court of Appeals Nos. L-17-1194
L-17-1246

Trial Court No. CI0201403549

**DECISION AND JUDGMENT**

Decided: August 17, 2018

* * * * *

Eugene F. Canestraro, for appellee.

William R. Lindsley, for appellant.

* * * * *

**SINGER, J.**

**{¶ 1}** Appellant, Job1USA, Inc. ("Job1"), appeals the June 29 and September 19, 2017 judgments of the Lucas County Court of Common Pleas awarding damages and prejudgment interest to appellee, Quest Workforce Solutions, LLC ("Quest"). For the following reasons, we reverse.

## I. Background and Facts

{¶ 2} This consolidated appeal involves a business dispute between Quest and Job1 that is before us for the second time. In the first case, *Quest Workforce Solutions, LLC v. Job1USA, Inc.*, 6th Dist. Lucas No. L-15-1189, 2016-Ohio-8380 ("*Quest I*"), we reversed the trial court's decision finding in favor of Job1 on Quest's breach of contract and accounting claims and remanded the case for a determination of damages. Although we thoroughly discussed the facts in *Quest I*, we will briefly summarize the facts that are pertinent to the current appeal.

{¶ 3} In 2007, Job1 and Quest entered into a "Memorandum of Understanding Referral and Profit Sharing Agreement" ("PSA") under which Job1 was to serve as the staffing agency for any companies referred to it by Quest and the parties would equally divide any profits from the accounts. Job1 properly terminated the PSA in 2012.

{¶ 4} The only Quest referral that generated any business for Job1 was a company called Yamada.[1] According to income statements created by Job1's chief financial officer ("CFO"), Matt Wolfe, the Yamada account operated at a loss every year from 2008 to 2012. Quest, through the testimony of member Jack Hackett, disputed many of the expenses reflected in the statements, including: a monthly expense equal to three percent of the gross sales generated by the Yamada account that Job1 charged for Yamada's share of certain direct expenses that were common to all of Job1's clients (e.g.,

---

[1] There was a second client that was part of the PSA, but the company unexpectedly closed shortly after the PSA was signed.

2.

payroll and human resources staff, insurance premiums, and banking costs) ("add-on expenses"); numerous direct expenses for which Job1 did not retain or produce any supporting documents, as was required by the PSA; and the amount of workers' compensation premiums that Job1 deducted from the gross profits. When the improper expenses were removed from the income statements, Quest claimed, the Yamada account made a profit every year. We addressed each category of expenses in *Quest I*.

{¶ 5} The PSA defined "profits" as gross profit minus direct expenses and the costs of one account manager. The parties disputed the meaning of "direct expenses." Job1 claimed (based on Wolfe's expert testimony as a certified public accountant) that direct expenses included the add-on expenses, while Quest claimed (based only on parol evidence) that the parties specifically excluded those costs from direct expenses. In *Quest I*, we found that the trial court properly interpreted the phrase to include add-on expenses, which were reflected in Job1's deduction from the gross profits of an amount equal to three percent of sales. *Quest I*, 6th Dist. Lucas No. L-15-1189, 2016-Ohio-8380, at ¶ 49.

{¶ 6} As to the undocumented expenses, the PSA required that both parties "jointly maintain all necessary recordkeeping pertaining to" the Yamada account. We found in *Quest I* that Job1 breached its duty under the PSA to retain the documents supporting its gross profit calculations and its duty in discovery to supply Quest with accurate financial information that Quest could use to substantiate its claimed damages. *Id.* at ¶ 52-53.

3.

{¶ 7} The workers' compensation premiums were the subject of exhaustive testimony at the trial. As we stated in *Quest I*, "the evidence is undisputed that there was a significant error either in the [workers' compensation] rate, [workers' compensation] payments, or [workers' compensation] cost allocation." *Id.* at ¶ 52.

{¶ 8} Everyone agreed that the workers' compensation expenses that Job1 reported in the income statements for 2008 to 2012 did not reflect Job1's actual workers' compensation expenses. In November 2013, in response to Hackett's inquiry, Job1 sent Quest new workers' compensation figures. The 2013 numbers included the rates that the Ohio Bureau of Workers' Compensation ("BWC") charged for Yamada's classification code and the portions of two rebates from BWC that were allocated to the Yamada classification code. Approximately a year later, Job1's vice president of human resources, Kimberly Hall, who was responsible for filing premium reports with BWC, provided printouts from BWC's payment system relating to Job1's account. The 2014 numbers showed the rates that BWC charged for Yamada's classification code, the amount of payroll Job1 reported to BWC, and the premium payments Job1 actually made for each of the five years. The rate for Yamada's classification code is the same in both the 2013 workers' compensation figures and the 2014 BWC printouts. While the wages reported in the income statements and the 2013 documents are consistent, the wages reported in the BWC system are significantly lower. Both Hall and Wolfe testified that the wages conveyed to BWC were underreported and, consequently, Job1's workers' compensation payments (as reflected on the BWC printouts) were inaccurate. Neither

4.

was able to provide the amount Job1 actually owed to BWC as a result of the underreported wages. Quest and its counsel learned at trial about Job1's claim that it had underreported wages to BWC.

{¶ 9} On remand, the trial court (ostensibly relying on our decision in *Quest I*) found that the only evidence of damages before it was Hackett's testimony. Quest based its calculation of damages on the income statements that Wolfe prepared, but removed the three percent add-on expenses, removed all undocumented expenses, and adjusted the workers' compensation premiums to the amounts reflected on the BWC printouts. In its June 29, 2017 judgment entry, the trial court fully adopted Quest's calculations and awarded Quest damages in the amount of $418,911, plus prejudgment interest of $52,137, for a total award of $471,048.

{¶ 10} On September 19, 2017, the trial court issued a judgment entry amending its award of prejudgment interest. Quest asked for the amendment because the initial prejudgment interest amount was based on a judgment rendered in May 2015, but it claimed that interest should have been calculated as of June 29, 2017, the date the court issued its judgment on remand. Job1 argued that Quest was not entitled to prejudgment interest as a matter of law and asked the court to deny Quest's motion. The court agreed with Quest and amended its prejudgment interest award to $80,569, bringing the total damages award to $499,480.

{¶ 11} Job1 appeals the trial court's decision, setting forth two assignments of error:

5.

ASSIGNMENT OF ERROR NO. 1.  THE TRIAL COURT ERRED BECAUSE IT FAILED TO CONSIDER THE OVERWHELMING EVIDENCE PRESENTED BY THE DEFENDANT TO REBUT THE PLAINTIFF'S CLAIMS OF DAMAGES.  NEVERTHELESS, THE TRIAL COURT INCORRECTLY RULED THAT "…THE ONLY EVIDENCE OF DAMAGES BEFORE THIS COURT IS THE TESTIMONY OF MR. HACKETT."

ASSIGNMENT OF ERROR NO. 2.  THE TRIAL COURT ERRED IN AWARDING PREJUDGMENT INTEREST WITHOUT FIRST CONDUCTING AN EVIDENTIARY HEARING TO DETERMINE WHEN THE PLAINTIFF'S DAMAGES BECAME DUE AND PAYABLE AND IN DOING SO, ABUSED ITS DISCRETION.

## II.  Law and Analysis

{¶ 12} In its first assignment of error, Job1 argues that the trial court's damages award is against the manifest weight of the evidence because the trial court either failed to consider or ignored Job1's evidence supporting its theory that the PSA was not profitable.  In its second assignment of error, Job1 contends that the trial court abused its discretion by not conducting a hearing to determine when Quest's damages became due and payable.  Quest responds that Job1 fails to show that the damages award is unsupported by the manifest weight of the evidence and that the trial court correctly determined that date when prejudgment interest began to accrue.

6.

## A. Damages Award

{¶ 13} Job1's first assignment of error focuses on the shortcomings it perceives in the trial court's decision on damages. Namely, Job1 contends that the trial court ignored all of the evidence Job1 presented at trial showing that the Yamada account was not profitable for any of the five years that the PSA existed. We agree with Job1 to the extent that the trial court excluded the three percent charges for add-on expenses.

{¶ 14} Initially, we note that Job1 challenges the trial court's award of damages as against the manifest weight of the evidence. We generally review a trial court's judgment from a bench trial under a manifest-weight standard of review. *E.G. Licata, LLC v. E.G.L., Inc.*, 6th Dist. Lucas Nos. L-17-1124 and L-17-1125, 2018-Ohio-2032, ¶ 12, citing *United States Fire Ins. v. Am. Bonding Co.*, 1st Dist. Hamilton Nos. C-160307 and C-160317, 2016-Ohio-7968, ¶ 16-17. Job1 is not challenging the trial court's judgment on the merits of Quest's complaint, however, but essentially argues that the damages award is excessive. We review a trial court's determination of damages for an abuse of discretion. *Universal Marble & Granite, LLC v. Gerner*, 6th Dist. Wood No. WD-13-052, 2014-Ohio-4349, ¶ 11, citing *Roberts v. United States Fid. & Guar. Co.*, 75 Ohio St.3d 630, 634, 665 N.E.2d 664 (1996). Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

{¶ 15} Damages in a breach-of-contract case are intended to compensate the non-breaching party for the losses suffered as a result of a breach. *Decastro v. Wellston City*

7.

*School Dist. Bd. of Edn.*, 94 Ohio St.3d 197, 201, 761 N.E.2d 612 (2002). Thus, money damages awarded for breach of contract are designed to put the non-breaching party in the same position it would have been in if the contract had not been violated. *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 105 Ohio St.3d 476, 2005-Ohio-2974, 829 N.E.2d 298, ¶ 26.

{¶ 16} As a general rule, although a plaintiff in a civil case must prove its damages with certainty, it is permitted to reasonably estimate the amount of the damages. *Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443, ¶ 30, quoting *TJX Cos. v. Hall*, 183 Ohio App.3d 236, 2009-Ohio-3372, 916 N.E.2d 862, ¶ 32 (8th Dist.). That is, the plaintiff must prove that it suffered damages, but is not necessarily required to prove the amount of the damages with absolute precision. *Id.*; *Secy. of Veterans Affairs v. Shaffer*, 5th Dist. Richland No. 14 CA 61, 2015-Ohio-2237, ¶ 53 ("It is uncertainty as to the *existence* of damages rather than uncertainty as to their *amount* which precludes recovery." (Emphasis sic.)). This is particularly true in cases where the plaintiff is unable to precisely calculate its damages because of the defendant's actions. *Gateway Consultants* at ¶ 31. In such cases, the plaintiff's proof of damages is sufficient if it provides a reasonable basis for estimating the damages. *TJX Cos.* at ¶ 32, citing *Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 559-560, 61 S.Ct. 379, 85 L.Ed. 336 (1941) and *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

8.

**{¶ 17}** In this case, the trial court found that Hackett's testimony was the only evidence of damages before it and that Job1 failed to refute Hackett's "simple arithmetic calculations." It then fully adopted Hackett's calculations. While we find that the trial court correctly excluded certain undocumented expenses from the figures in the 2008 to 2012 income statements and properly used the payment information from the BWC system, we conclude that its exclusion of the three percent charges for add-on expenses was in error.

**{¶ 18}** First, we find that the trial court properly excluded the expenses that Job1 claimed against the Yamada profits, but for which it did not provide supporting documentation. As we discussed in *Quest I*, Job1 had a duty under the PSA to maintain documents that support its profit calculations. *Quest I*, 6th Dist. Lucas No. L-15-1189, 2016-Ohio-8380, at ¶ 52. Using the entries from Job1's ledger that Job1 provided in discovery, Hackett identified numerous expenses that would have been proper if Job1 had also provided supporting documents such as invoices, receipts, or canceled checks. Hackett testified about the "simple arithmetic calculations" that he did using the figures in each income statement to arrive at the profits that Hackett believed were proper under the PSA. The only evidence Job1 proffered to refute Hackett's testimony about the undocumented expenses was Wolfe's testimony that Job1 incurred each expense. Considered with Wolfe's admission that he did not know if some of the ledger entries were accurate because he never audited the underlying financial information, we find that

9.

the trial court did not abuse its discretion by discrediting Wolfe's testimony and excluding these expenses from its damage calculations.

{¶ 19} We also find that using the payment details from BWC as Job1's workers' compensation expenses for Yamada was not an abuse of discretion. In cases where the plaintiff cannot precisely calculate its damages, the plaintiff is responsible for providing the trial court with a reasonable means of estimating damages. *TJX Cos.*, 183 Ohio App.3d 236, 2009-Ohio-3372, 916 N.E.2d 862, at ¶ 32. Here, Quest proposed that the court use the evidence of Job1's actual payments to BWC as the amount of workers' compensation expenses that Job1 had for Yamada. Its basis for using the BWC numbers was that Job1's reporting errors and failure to provide accurate information made it impossible for Quest to calculate its damages accurately. By fully adopting Quest's damages calculations, the trial court implicitly adopted Quest's means of estimating damages. We agree with the trial court that Quest's estimations were reasonable.

{¶ 20} The testimony showed that no one—including Job1 and its executives—could articulate the actual workers' compensation expenses related to the Yamada account. The premiums included in the 2008 to 2012 income statements were grossly overstated compared to the premiums reported in the 2013 numbers. And the premiums in the 2013 numbers were grossly overstated compared to the payments that Job1 made to BWC. For example, in 2011 (the year with the smallest discrepancies), the income statement claimed workers' compensation expenses of $74,744, the 2013 numbers claimed expenses of $59,532.94, and the BWC system showed payments totaling

10.

$25,828.54. The difference between the expenses in the income statement and the expenses in the 2013 numbers is $15,211.06; the difference between the 2013 numbers and the actual BWC payment is $33,704.40. Wolfe and Hall both testified that the discrepancies must have been caused by some error in their accounting system; they each denied intentionally reporting incorrect figures. But Wolfe, who is both Job1's CFO and a certified public accountant, did not conduct an audit or attempt to identify the reason for the system errors before trial. Given this information, it would have been unreasonable for the trial court to take Job1 at its word that the 2013 numbers accurately reflect its workers' compensation expenses. We therefore find that the trial court did not abuse its discretion by using the BWC payment numbers in calculating Quest's damages.

{¶ 21} Finally, we find that the trial court erred by deducting the three percent add-on expenses from the figures in the 2008 to 2012 income statements. Again, as we discussed in *Quest I*, the interpretation of the term "direct expenses" was a matter of law for the court to decide, and the only non-parol evidence of the meaning was Wolfe's expert testimony that it included the add-on expenses. *Quest I*, 6th Dist. Lucas No. L-15-1189, 2016-Ohio-8380, at ¶ 49. Thus, the PSA allowed Job1 to deduct the add-on expenses from the gross profits generated by Yamada, as Wolfe did when he prepared the income statements. By adopting Hackett's damages calculations wholesale, the trial court refused to credit Job1 with the add-on expenses, which was contrary to the terms of the parties' contract. Accordingly, we find that the trial court erred by failing to consider the add-on expenses in awarding damages.

11.

{¶ 22} In sum, the trial court correctly excluded undocumented expenses and used the evidence of Job1's actual payments to BWC in determining damages. But we find that the trial court abused its discretion because it failed to include the add-on expenses in its damages calculations. Therefore, we find that Job1's first assignment of error is well-taken.

{¶ 23} Under App.R. 12(A)(1)(a) and (B), we have the authority to "affirm, modify, or reverse" trial court judgments, which encompasses the ability to "render the judgment the trial court should have entered." *Bell v. Turner*, 4th Dist. Highland Nos. 12CA14 and 12CA15, 2013-Ohio-1323, ¶ 20, citing *Superior Metal Prods., Inc. v. Admr., Ohio Bur. of Emp. Servs*, 41 Ohio St.2d 143, 145, 324 N.E.2d 179 (1975). After reviewing the evidence in the record, we find that the appropriate damages award is $185,627.34. This amount reflects a deduction of $233,283.66 from the trial court's award of $418,911.[2] Therefore, pursuant to App.R. 12(A)(1)(a) and (B), we modify the damages award to $185,627.34.

**B. Prejudgment Interest**

{¶ 24} In its second assignment of error, Job1 contends that the trial court abused its discretion by awarding prejudgment interest to Quest without conducting a hearing to

---

[2] The add-on expenses are: $27,295.65 for 2009; $58,657.17 for 2010; $46,063.11 for 2011; and $101,267.73 for 2012. There are no add-on expenses for 2008. Wolfe testified that his predecessor prepared the income statement for 2008, and he did not modify the 2008 numbers compiled by his predecessor. Thus, the 2008 income statement does not contain a three percent charge for add-on expenses.

12.

determine when Quest's damages became due and payable. Quest argues that the trial court had sufficient information before it (in the form of trial testimony) to select a date on which profits became due and payable to Quest, so no separate hearing was required.

{¶ 25} An award of prejudgment interest is governed by R.C. 1343.03(A). The statute provides, in relevant part, that

> [W]hen money becomes due and payable * * * upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of * * * a contract * * *, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.

The statute does not require the court to hold a postjudgment hearing before awarding prejudgment interest. *Bischoff v. Bischoff*, 6th Dist. Huron No. H-05-005, 2005-Ohio-5879, ¶ 10.

{¶ 26} Generally speaking, prejudgment interest "acts as compensation and serves ultimately to make the aggrieved party whole." *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 117, 652 N.E.2d 687 (1995). The purpose of prejudgment interest is to compensate the plaintiff "for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based upon a claim which was

13.

liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court." *Id.* at syllabus.

{¶ 27} In contract cases, the prevailing plaintiff is entitled to prejudgment interest as a matter of law. *Kott Enters., Inc. v. Brady*, 6th Dist. Lucas No. L-03-1342, 2004-Ohio-7160, ¶ 73. Once judgment is rendered for the plaintiff, the only issue remaining for the trial court to resolve with respect to prejudgment interest is how much interest is due. *Brondes Ford, Inc. v. Habitec Sec.*, 2015-Ohio-2441, 38 N.E.3d 1056 (6th Dist.), ¶ 166, citing *Zunshine v. Cott*, 10th Dist. Franklin No. 06AP-868, 2007-Ohio-1475, ¶ 26. To properly award prejudgment interest, the trial court must make factual findings about the date the interest begins to accrue (based on when the claim became due and payable) and the rate of interest that applies. *Id.*, citing *Dwyer Elec., Inc. v. Confederated Builders, Inc.*, 3d Dist. Crawford No. 3-98-18, 1998 Ohio App. LEXIS 5490 (Oct. 29, 1998).

{¶ 28} Prejudgment interest accrues on a contract claim from the time that the money due to the plaintiff should have been paid. *Bell v. Teasley*, 10th Dist. Franklin No. 10AP-850, 2011-Ohio-2744, ¶ 27. The trial court must decide the date of accrual on a case-by-case basis. *Brondes* at ¶ 164, citing *Miller v. Gunckle*, 96 Ohio St.3d 359, 2002-Ohio-4932, 775 N.E.2d 475, ¶ 32, fn. 4, and *Gates v. Praul*, 10th Dist. Franklin No. 10AP-784, 2011-Ohio-6230, ¶ 62. Indeed, the Supreme Court of Ohio has "specifically and clearly" declined to create a bright-line rule for establishing the accrual date of prejudgment interest. *Id.*

14.

{¶ 29} We review the trial court's award of prejudgment interest for an abuse of discretion. *Brondes* at ¶ 167.

{¶ 30} Here, the trial court had no duty to hold a hearing on prejudgment interest. Consequently, its failure to do so was not an abuse of discretion. Nevertheless, we find that the trial court abused its discretion by issuing the award without determining when the money owed to Quest became due and payable or the appropriate interest rates.

{¶ 31} It appears from the record that the court adopted the interest calculations Quest submitted with its post-trial brief and its motion to amend prejudgment interest. Regardless, the court's September 19, 2017 judgment entry amending its initial award of prejudgment interest does not indicate when the interest began to accrue or specify the applicable interest rate. "[A] court speaks only through its journal entries" and "[n]either the parties nor a reviewing court should have to review the trial court record to determine the court's intentions. Rather, the entry must reflect the trial court's action in clear and succinct terms." *Infinite Sec. Solutions, LLC v. Karam Props. II, Ltd.*, 143 Ohio St.3d 346, 2015-Ohio-1101, 37 N.E.3d 1211, ¶ 29. Because we cannot determine from the trial court's entry how it calculated the prejudgment interest award, we find that the award constitutes an abuse of discretion. Therefore, Job1's second assignment of error is well-taken.

### III. Conclusion

{¶ 32} After carefully reviewing the record, we find that the trial court abused its discretion in awarding damages to Quest because the court excluded the three percent

charges for add-on expenses from its calculations. Factoring those costs into the damages award results in an award of $185,627.34 to Quest.

{¶ 33} We also find that the trial court abused its discretion by failing to determine when prejudgment interest began to accrue and the interest rates that apply.

{¶ 34} Accordingly, the June 29 and September 19, 2017 judgments of the Lucas County Court of Common Pleas are reversed. The award of damages is modified to $185,627.34 and this matter is remanded for determination of prejudgment interest consistent with this decision. Quest is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                    _____
                                                               JUDGE
Arlene Singer, J.

James D. Jensen, J.                           _____
CONCUR.                                                JUDGE

                                                       _____
                                                               JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.