[Cite as *Fremont Cutting Dies, Inc. v. Trigo Quality Solutions US, Inc.*, 2025-Ohio-5167.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

Fremont Cutting Dies, Inc.

    Appellee

v.

Trigo Quality Solutions US. Inc.

    Appellant

Court of Appeals No.  S-25-002

Trial Court No.  23 CV 205

**<u>DECISION AND JUDGMENT</u>**

Decided: November 14, 2025

* * * * *

Andrew Mayle, Richard Gillum, Benjamin Padanilam, and Nichole Papageorgiou, for appellee.

Matthew Kemp, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant Trigo Quality Solutions US, Inc. ("Trigo") appeals the judgment of the Sandusky County Court of Common Pleas, following a bench trial, which awarded $116,500 in damages to appellee Fremont Cutting Dies, Inc. ("Fremont") on its claim for breach of contract.  For the reasons that follow, the trial court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} Trigo is a third-party parts inspection service. In 2011, it needed to acquire space to complete an extended project for Whirlpool. Trigo found a suitable 12,500-square foot location, which was the east bay of a two-bay warehouse operated by Fremont.

{¶ 3} On March 28, 2011, Trigo and Fremont entered into a lease agreement.[1] The agreement provided that Trigo was to "commit no act of waste and shall take good care of the Premises," "maintain the leased premises in a clean and orderly manner," and "surrender them at the termination of the lease in the condition found, ordinary wear and tear accepted (sic)."

{¶ 4} In March 2022, Trigo ended the lease and vacated the premises. Fremont filed its complaint for breach of contract on March 10, 2023. Ultimately, the matter proceeded to a one-day bench trial on October 3, 2024.

{¶ 5} The dispute in this case centers on two things: (1) whether and to what extent Trigo damaged the warehouse walls, and (2) the appropriate amount of damages.

{¶ 6} At the trial, Jason Binger testified to the condition of the premises before Trigo moved in. He stated that in 2011 Fremont tasked him with cleaning out the warehouse to prepare it for Trigo, which he worked on intermittently for

---

[1] Trigo was formerly known as The PIC Group, Inc. and entered into the lease agreement under that name. Trigo does not distinguish between the two entities in its appellate brief, and for ease of discussion neither will this court.

2.

one to two weeks.  Binger was shown pictures depicting the outer walls of the warehouse pushed away and separated from the building's foundation, leaving a gap of several inches.  The gap was filled with paper, cardboard, and other debris.  He testified that the walls were not in that condition in 2011.  He also testified that in 2011 no daylight was entering the warehouse through the walls.  Binger, however, could not identify where in the warehouse those pictures were taken, nor could he identify when those pictures were taken.  Binger was also shown a picture of the interior, cinder block wall separating the two warehouses.  The blocks were cracked at the bottom where the wall met the floor.  Again, Binger could not identify what part of the wall the picture depicted.  Finally, Binger testified that he was not in the warehouse between 2011 and 2023, but when he returned, "it was night and day" from what he remembered.

{¶ 7} Jonathan Abdoo testified that Fremont hired him in 2011 to install some lighting in the east bay warehouse in anticipation of Trigo moving into the space.  He worked over the course of three days, during which time the warehouse was empty.  When he was shown the same pictures that were shown to Binger, he testified that the walls did not look like that in 2011.  He stated that while he was working, he "did not see anything that I would say would be obvious damage.  . . . I would call the building just normal.  Nothing drew my attention to it, so it would be just average, normal."

{¶ 8} Jonathan further testified that he was in the east bay warehouse roughly three to six times a year between 2011 and 2022 to perform minor repairs.

3.

During that time, Trigo was operating in the warehouse. Jonathan testified that he observed stacks of things "multiple pallets high" on the exterior walls, and fewer stacks of pallets on the interior concrete block wall. He noted that the area around the loading dock was clear so that everyone, including Fremont, could use it.

{¶ 9} Greg Abdoo, Jonathan's cousin and the owner of Fremont, testified that his father, George Abdoo, owns the building at issue, which was built around 1988 to 1990. In 2000, Greg bought the family business, Fremont, and has been operating it in the building since that time.

{¶ 10} Greg identified the pictures that had been shown to Binger and Jonathan, stating that they were taken in April 2016. He testified that in 2011, prior to Trigo moving in, there was no damage like that shown in the pictures. Greg also identified pictures of the building that he took recently. In the new pictures, the condition of the building remained unchanged from 2016, but the pictures gave a better perspective on the amount and location of the damage to the walls. Greg testified that in the sections where the greatest damage occurred, Trigo had hung signs that stated, "Incoming Materials," "Incoming," "Certified Material," "Outgoing," and "Reject Material." Greg testified that in the sections where Trigo had not hung signs, the walls were not damaged beyond what he would describe as ordinary wear and tear. Greg believed that the walls were damaged by the forklift operators pushing the pallets together and against the wall during the loading and unloading of the product. He stated at times the pallets would be stacked four high and two or three deep.

4.

{¶ 11} When Greg discovered the damage in 2016, he contacted his father and his attorney. A meeting was set up within a few days with Bobbi Ayres, a Senior Site Lead for Trigo. George Abdoo testified that he confronted Ayers about the damage and showed her the pictures. According to George, Ayres took exception to the damage to the interior cement block wall but did not say that they did not cause the damage to the exterior metal walls. Ayres said there were some dents in the walls when Trigo moved in but then Trigo pushed the walls out. Ayres assured George that Trigo would take care of its damages when it moved out and "they would not stiff [him]." George accepted Ayres's assurance because he believed "she recognized that they caused the damage and that they were going to take care of the damage."

{¶ 12} Ryan Anstead, a project manager for Anstead Construction, testified about the cost of repairing the building. From the pictures, he identified that the foundation was damaged, the base channel was completely detached from the foundation, and the metal wall was pushed out beyond the foundation. He also could see cracks in the foundation. Further, the bond beam—a concrete block that sits on top of the foundation and to which the metal walls are anchored—was broken in places and pushed off the foundation. He testified that in some of the pictures he could see light coming in from under the walls where they were pushed out.

{¶ 13} Anstead described the damage as structural. To fix the walls he stated that the metal would have to be removed to access the foundation and then

his company would have to excavate along the foundation to inspect the blocks below to see if they were damaged. He explained that the metal can be removed in three-foot sections, but "the entire length of [the two exterior] walls are in question, . . . I don't see any way that we could just remove a piece here and a piece there to make those repairs." He testified that they would then remove what is left of the damaged bond beam, clean up and grout the cores of the block below, add some rebar so that the bond beam could be reinstalled at the top, and then reattach the metal. When asked if any of the metal could be reused, he testified, "maybe a small amount of it. It's -- it's in pretty rough shape."

{¶ 14} Anstead's written project proposal was submitted as an exhibit. He defined the scope of work as removing and replacing approximately 180 feet of metal siding and insulation, which constituted the two exterior walls of the east bay of the warehouse, removing and replacing the damaged foundation, and installing new trims, gutters, and downspouts. The estimated project cost, including labor and materials, totaled $116,650.00. On cross-examination, he testified that the insulation would need to be replaced because it would come off as the metal paneling was removed. Similarly, the trims, gutters, and downspouts would need to be replaced because they are affixed to the metal paneling. On redirect, he was asked if those items could be reused. He stated it was possible depending on how the building came apart, but the trims, gutters, and downspouts would all have holes in them from previous fasteners, and he would not put his name on a project where he had to reuse those items.

6.

{¶ 15} Trigo then presented its case, beginning with the testimony of Bobbi Ayres. Ayres testified that when she first toured the warehouse before entering into the lease agreement it was dark, dirty, and "used and abused." She and some of her relatives spent a few days cleaning it before Trigo moved in. She said they hosed down the walls and floors to try and eliminate all the dust. While cleaning, she noticed that racoons were coming into the building. She testified that she brought the issue to Greg within the first two weeks, but he did not address the problem. Eventually, Trigo took a pallet and set it against the hole and braced it so that the racoons could no longer get through.

{¶ 16} Ayres continued to describe the initial condition of the building, stating that the metal walls were warped and dented and there was a section by the overhead door that was "V'ed out a little bit," meaning that it looked like it had been pushed out. She further mentioned that there were gaps around the dock doors, but "it was a warehouse . . . it wasn't the Taj Mahal." When asked about the condition of the foundation, Ayres testified that "There was no -- no other issues other than the wall basically."

{¶ 17} She testified that Trigo never caused any damage to the walls of the warehouse beyond ordinary wear and tear, stating that it was "actually very, very careful." She stated that she could not say for certain that Trigo did not add to the pushed out area by the overhead doors, but at the time Trigo moved in she could already see daylight coming in through the bottom of that area.

7.

{¶ 18} After Trigo ended the lease and moved out in March 2022, she received an e-mail from Greg asking about the damage that was done to the building that she had discussed with George a few years back, and inquiring when and how the repairs would take place. Ayres believed that Greg was referring to the area by the overhead doors that was already "V'ed out" and which she acknowledged Trigo might have contributed to the damage that was already there. She testified that when she spoke with George in April 2016, he only mentioned the area by the overhead door, and she said that her company would take care of that, meaning it was beyond the scope of her job. She testified that George did not show her any pictures of any damage at that time.

{¶ 19} Ayres then identified pictures taken in 2024 that showed the warehouse walls, including the area by the overhead door that was pushed out, and through which one could see daylight. In the pictures, sections of the wall were dented or pushed out at the bottom. She testified that the pictures were the same as what the warehouse looked like when Trigo moved in.

{¶ 20} On cross-examination, Ayres testified that Trigo hung the three "Certified Material" signs and one "Rejected" sign, but the "Incoming" and "Outgoing" signs were already present in the warehouse. She also testified that at no time were the pallets stacked three high, nor were they stacked near the walls because there always had to be enough space for someone to walk around them to get order or unit numbers.

8.

{¶ 21} Trigo next called Daniel Kingsborough, a former Supplier Quality Engineer for Whirlpool. Kingsborough testified that he was in the warehouse "very frequently" through 2017, sometimes as many as five days per week. He stated that the warehouse was not "the cleanest building" and he remembers seeing some bent metal on the interior walls around the opening for the overhead door. He described that Trigo would stack skids of boxes along the walls, including the two exterior metal walls, but the skids were not flush against the wall. He stated that the skids were "a couple feet" from the walls, far enough that he could pass between to verify date codes and part numbers. Looking at pictures taken in 2024, Kingsborough testified that the condition of the walls was the same or similar as it was when he was first in the warehouse.

{¶ 22} On cross-examination, Kingsborough was shown the pictures taken in 2016 of the walls being separated from the foundation and testified that he did not remember anything like that when he first entered the building.

{¶ 23} The final witness to testify was Thomas Reinhart, owner of the construction company Solvzall, LLC. Reinhart provided an estimate for the repairs to the east bay warehouse. He testified that when he examined the building, he noticed that it "was in pretty rough shape," and that the metal paneling had been dented from the inside pushing it out, and a lot of the "rat wall" was knocked over with daylight showing through. He described that he would disassemble and reassemble the wall, he would "dig out that rat wall and go down 36 inches . . ., re-pour a new footer four course of block up, set the new sill plate,

9.

and then build off of that." He produced a quote of $30,000 to fix one approximately 20-foot section of the wall, which included the new foundation, metal panels, trim, and gutters, as well as labor.

{¶ 24} Reinhart testified on cross-examination that he was requested to give a quote for the whole project, which he said was somewhere between $270,000 to $300,000, but was then asked by Trigo to revise the quote to only cover one section. He stated that his initial quote was for the damage that existed all the way around the building, similar to what Anstead quoted. He testified that if he was asked to do just one section, which he estimated would cost $30,000, he would probably decline to do the job because he would want to do the whole thing and would not want to put his name on that type of a fix.

{¶ 25} Following the testimony, the trial court performed a judicial view of the warehouse the next day upon the request of Fremont. The parties then submitted their closing arguments by brief.

{¶ 26} The trial court entered its judgment on December 19, 2024. In the judgment entry, the trial court recounted the testimony presented at trial and what it observed during its site visit. In particular, the trial court stated,

> The Court observed continuous damage along the South and East walls of the space. The Court observed damages to braces about 8' to 10' high as well as scratch marks on the floor that run perpendicular to the walls. The Court also observed debris, pipe and other stuff in the gap created by the pushed-out walls. The Court observed similar damage, but not nearly as extensive, in [Fremont's] warehouse space. Here the walls were damaged in spots at the bottom but not pushed away from the foundation.

10.

{¶ 27} The trial court then found that "[o]rdinary wear and tear would not include knocking a wall from the existing rat-wall (foundation). [Fremont] has proved by a preponderance of the evidence that [Trigo] breached the terms of the lease."

{¶ 28} Regarding damages, the trial court found that Anstead estimated the repairs would cost $116,650.00. Reinhart estimated it would cost $30,000 to repair one section of the wall, but the trial court found "[t]here was no rational connection of Mr. Reinhart's estimate to the damage to the building," noting that "[Reinhart] admitted that he would not do one section of the wall if asked to complete the job."

{¶ 29} The trial court, therefore, entered judgment in favor of Fremont in the amount of $116,650.00.

## II. Assignments of Error

{¶ 30} Trigo timely appeals the December 19, 2024 judgment of the Sandusky County Court of Common Pleas, asserting two assignments of error for review:

> 1. The trial court misapplied the law of causation where it awarded the plaintiff-appellee landlord the full cost of replacement of the exterior walls and foundations of the premises, despite finding that holes in the walls existed at the beginning of the defendant-appellant tenant's lease term.

> 2. The trial court misapplied the law of damages by awarding plaintiff-appellee the full cost of replacement of the premises' exterior walls and foundations, including portions that plaintiff-

appellee did not allege that defendant-appellant damaged beyond ordinary wear and tear.

### III. Analysis

{¶ 31} In Trigo's first assignment of error, it argues that the trial court misapplied the law of causation when it concluded that Trigo caused damage to the entirety of the exterior walls when it may have only damaged one section. Relatedly, in its second assignment of error, Trigo argues that the trial court misapplied the law of damages when it awarded the entire cost to replace the walls without deductions for (1) any existing damage, (2) ordinary wear and tear, and (3) the portions of the walls that were not damaged. Because Trigo's assignments of error are interrelated, they will be discussed together.

{¶ 32} "In an appeal from a civil bench trial, we generally review the trial court's judgment under a manifest-weight standard of review." *Bonner v. Delp*, 2021-Ohio-3772, ¶ 38 (6th Dist.), quoting *Mike McGarry & Sons, Inc. v. Constr. Resources One, LLC*, 2018-Ohio-528, ¶ 90 (6th Dist.). In so doing, "[w]e weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered." *Mike McGarry & Sons* at ¶ 90, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of

12.

the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶ 33} But, where an appeal from a bench trial presents questions of law, we review such legal issues de novo. *Marshall v. Snider-Blake Business Serv., Inc.*, 2022-Ohio-1869, ¶ 13 (10th Dist.), *appeal not allowed*, 2022-Ohio-3322; *Mike McGarry & Sons* at ¶ 90. Accordingly, the trial court's legal conclusions will be reviewed de novo, while its factual conclusions will be reviewed under the manifest weight standard.

{¶ 34} Trigo and Fremont agree that in a breach of contract action, the claimed damages "must be the natural and proximate result of the defendant's breach." *Simbo Properties, Inc. v. M8 Realty, L.L.C.*, 2019-Ohio-4361, ¶ 11 (8th Dist.), quoting *Claris, Ltd. v. Hotel Dev. Servs., L.L.C.*, 2018-Ohio-2602, ¶ 28 (10th Dist.). That is, "such damages must be caused by the breach, or such damages would not have occurred had the defendant performed the promises which he made in the contract." *Simbo* at ¶ 14, citing *Cammerer Farms v. Terra Intl., Inc.*, 1991 WL 274322 (12th Dist. Dec. 23, 1991).

{¶ 35} The parties disagree, however, over the extent of the damage caused by Trigo. Trigo argues that the walls already had holes in them as evidenced by the family of raccoons that came into the building shortly after the lease began. In addition, Trigo contends that some portions of the walls and foundation were not damaged, and there was no evidence that Trigo damaged the insulation, exterior gutters, or trim, all of which were included in the cost to repair the walls. It asserts

13.

that because portions of the walls already needed to be repaired before Trigo moved in and other portions did not need to be repaired at all, Fremont cannot establish that the damages would not have occurred but for Trigo's failure to perform its obligations under the contract.

{¶ 36} Notably, rather than finding damage to one, isolated section of the exterior walls, the trial court found that there was "continuous damage along the South and East walls of the space." It further determined that "[o]rdinary wear and tear would not include knocking a wall from the existing rat-wall (foundation)." It therefore concluded that Fremont proved by a preponderance of the evidence that Trigo breached the terms of the lease.

{¶ 37} Although Trigo frames the trial court's judgment as a misapplication of the law, the crux of its argument is that the trial court's decision is against the manifest weight of the evidence. Here, the trial court found that Trigo caused damage to the walls. Upon review of the evidence, this is not the exceptional case where the trial court clearly lost its way and committed a manifest miscarriage of justice.

{¶ 38} Binger and Jonathan Abdoo testified that they were in the warehouse before Trigo began its lease and did not notice any of the damage shown in the 2016 photographs such as the walls being pushed away from the foundation. Ayres also was in the warehouse before Trigo began its operations yet did not raise concerns about the conditions of the walls with Fremont, except to complain about the invading raccoons. Persuasive to this court is that in 2016, Greg and

14.

George Abdoo were so surprised by the condition of the walls that they immediately took pictures, contacted their attorney, and confronted Ayres. Further supporting the trial court's conclusion that Trigo damaged the walls is Greg's observation that most of the damage is located under the signs hung by Trigo for categorizing its materials. Although Trigo presented some evidence that it did not damage the walls through Ayres's and Kingsborough's testimony, the trial court's finding otherwise is not against the manifest weight of the evidence.

{¶ 39} This leads to Trigo's second contention, which is that it should not have to pay for brand-new exterior walls when it only damaged parts of the walls and the walls were already worn at the time the lease was executed.

{¶ 40} "Damages in a breach-of-contract case are intended to compensate the non-breaching party for the losses suffered as a result of a breach." *Quest Workforce Solutions, LLC v. Job1USA, Inc.*, 2018-Ohio-3304, ¶ 15 (6th Dist.), citing *DeCastro v. Wellston City School Dist. Bd. of Edn.*, 94 Ohio St.3d 197, 201 (2002); *DCI Rentals, LLC v. Sammons*, 2024-Ohio-1962, ¶ 12 (4th Dist.). "Thus, money damages awarded for breach of contract are designed to put the non-breaching party in the same position it would have been in if the contract had not been violated." *Id.*, citing *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 2005-Ohio-2974, ¶ 26; *DCI Rentals* at ¶ 12. "Although a party damaged by the acts of another is entitled to be made whole, the injured party should not receive a windfall." *DCI Rentals* at ¶ 12, quoting *Triangle Properties, Inc. v. Homewood Corp.*, 2013-Ohio-3926, ¶ 52 (10th Dist.).

15.

**{¶ 41}** The general rule for the appropriate measure of damages for injury to real property was originally set forth in *Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238 (1923). There, the Ohio Supreme Court held,

> If the injury is of a permanent or irreparable nature, the measure of damages is the difference in the market value of the property as a whole, including the improvements thereon, before and after the injury. If the injury is susceptible of repair, the measure of damages is the reasonable cost of restoration, plus reasonable compensation for the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property before and after the injury, in which case the difference in market value becomes the measure.

*Id.* at 248-249.

**{¶ 42}** As to injuries susceptible of repair—also described as temporary injuries—the Ohio Supreme Court implicitly limited the holding of *Ohio Collieries* by moving away from "strict market-value limits on damages, toward an approach to damages based on the reasonable costs of restoration" in *Northwestern Ohio Natural Gas Co. v. First Congregational Church of Toledo*, 126 Ohio St. 140 (1933), and *Apel v. Katz*, 83 Ohio St.3d 11 (1998). *Martin v. Design Constr. Servs., Inc.*, 2009-Ohio-1, ¶ 19.

**{¶ 43}** In *Martin*, the Ohio Supreme Court made express what it had implied in *First Congregational* and *Apel*. *Id.* at ¶ 24. It held,

> In an action based on temporary injury to noncommercial real estate, a plaintiff need not prove diminution in the market value of the property in order to recover the reasonable costs of restoration, but either party may offer evidence of diminution of the market value of the property as a factor bearing on the reasonableness of the cost of restoration.

16.

> While evidence of loss in market value of the property may be relevant, the essential inquiry is whether the damages sought are reasonable. Either party may introduce evidence to support or refute claims of reasonableness, including evidence of the change in market value attributable to the temporary injury. But proof of diminution in value is not a required element of the injured party's case.

*Id.* at ¶ 24-25. The facts in *Martin* involved temporary injury to noncommercial real estate. Appellate courts since *Martin* have explicitly recognized that the rule also applies to temporary injury to commercial real estate. *See*, *e.g., Monroe v. Steen*, 2009-Ohio-5163, ¶ 22 (9th Dist.) ("Although *Martin* involved residential property, we find that the concepts enunciated in *Martin* apply equally to injury to commercial property . . ..."); *Northpoint Properties, Inc. v. Charter One Bank*, 2011-Ohio-2512, ¶ 31, 37 (8th Dist.) ("Although *Martin* was decided in a 'noncommercial' context, the basic concepts followed therein have been applied in cases involving commercial property."); *B & B Contrs. & Developers, Inc. v. Olsavsky Jaminet Architects, Inc.*, 2012-Ohio-5981, ¶ 78 (7th Dist.); *Selbee v. Van Buskirk*, 2018-Ohio-1262, ¶ 37 (4th Dist.); *Oxford Campus I, LLC v. Michael*, 2024-Ohio-5614, ¶ 46 (10th Dist.).

**{¶ 44}** Applied here, the trial court's implicit determination that the reasonable cost to repair is the appropriate measure of damages is correct pursuant to *Martin*. Furthermore, the trial court's finding that $116,650 is a reasonable cost to repair the damage is not against the manifest weight of the evidence.

17.

{¶ 45} As to the amount of damages, Anstead testified that the paneling, insulation, gutters, and trim would have to be removed to access the foundation in order to repair it where the walls had been pushed away. He explained that even though the metal could be removed in sections, "the entire length of [the two exterior] walls are in question," and he did not "see any way that we could just remove a piece here and a piece there to make those repairs." He estimated the cost to repair the walls was $116,650. Similarly, Trigo's own expert, Reinhart, identified the damage to the foundation and the extent of repairs that were needed. Although he gave a revised quote of $30,000, he admitted that if he was asked to do just one section, he would probably decline to do the job because he would want to do the whole thing and would not want to put his name on that type of a fix. Reinhart estimated that the cost to do the whole project would be between $270,000 and $300,000.

{¶ 46} Thus, while Trigo may not have damaged every part of the exterior walls, according to Anstead and Reinhart, the reasonable cost to repair the damage it did cause includes entirely replacing those two walls. Furthermore, Trigo did not present any evidence of the loss of market value of the property as a factor bearing on the reasonableness of that cost to repair. The trial court's award of $116,650 in damages made in reliance on Anstead's estimate, therefore, is not against the manifest weight of the evidence.

18.

## IV. Conclusion

**{¶ 47}** In sum, the trial court properly applied the law when it found that Trigo damaged the exterior warehouse walls and that the appropriate amount of damages was the reasonable cost to repair those walls. The trial court's findings in that regard are not against the manifest weight of the evidence. Accordingly, Trigo's first and second assignments of error are not well-taken.

**{¶ 48}** For the foregoing reasons, the judgment of the Sandusky County Court of Common Pleas is affirmed. Trigo is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

_____
JUDGE

Charles E. Sulek, P.J.

_____
JUDGE

Jennifer L. Hensal, V.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.